**AMERICA ONLINE, INC., Plaintiff,**

v.

**AT & T CORP., Defendant.**

**No. Civ.A.98–1821–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 13, 1999.

Alice Stevens Fisher, Latham & Watkins, Washington, DC, Randall J. Boe, Dulles, VA, Craig Crandall Reilly, Richards, McGettigan, Reilly & West, PC, Alexandria, VA, for Plaintiff.

Terence P. Ross, Gobson, Dunn & Crutcher, Washington, DC, William Michael Merone, Kenyon & Kenyon, Washington, DC, for Defendant.

## MEMORANDUM OPINION

HILTON, Chief Judge.

This matter comes before the Court on Defendant's Motion for Summary Judgment as to their six declaratory judgment counterclaims seeking the Court's declaration that the marks at issue in this case are invalid. On June 16, 1999, this Court held a Status Conference and indicated to the parties that Summary Judgment would be entered in favor of AT & T concerning YOU HAVE MAIL, IM, and BUDDY LIST®. Thereafter, counsel for both AOL and AT & T agreed that AOL's claim concerning use of the mailbox logo should be withdrawn, as AT & T discontinued its use of the logo prior to the time that this suit was filed. Concerning the YOU'VE GOT MAIL mark, the Court allowed the parties further time to more fully brief whether or not the claim had become moot due to the Court's ruling on YOU HAVE MAIL.

Plaintiff America' Online, Inc. ("AOL") operates the world's largest interactive online service (the "AOL Service"). More than sixteen million people subscribe to, and are members of, the AOL Service. For a basic monthly fee, the AOL Service enables its members to disseminate and receive information by means of computer modem connections to AOL's computer network. The AOL Service also gives its members access to the Internet, which is a worldwide network of interconnected computer networks. AOL provides access to the Internet to more people than any other Internet access provider in the United States.

For nearly a decade, AOL has been using YOU HAVE MAIL and YOU'VE GOT MAIL in connection with its automat-

ic electronic mail (hereinafter "e-mail") notification services for AOL Service members. In early 1997, AOL began using an old-fashioned U.S. mailbox, with a red flag that pops up when a user has new e-mail, as a logo in connection with its automatic e-mail notification services.

Whenever a member starts an online session and has new e-mail, the folksy, cheerful spoken words YOU'VE GOT MAIL (recorded by Elwood H. Edwards, Jr., in 1989) are immediately heard. At the same time that this voice sounds, a logo of an old-fashioned mailbox with a red signal flag pointing upwards appears prominently on the member's computer screen above the phrase YOU HAVE MAIL (in the United Kingdom, AOL substitutes "POST" for "MAIL," because British English refers to "mail" as "post"). This same audio and visual display repeats itself whenever the member receives additional new e-mail during the course of an online session. Each of these three service marks (YOU HAVE MAIL, YOU'VE GOT MAIL, and the mailbox logo) announces the AOL member's arrival at the front door of the AOL Service. AOL contends that these prominent features have thereby become hallmarks of the entire AOL Service. AOL has applied for U.S. Federal trademark registrations for its YOU HAVE MAIL with mailbox design mark and YOU'VE GOT MAIL mark, though the U.S. Patent & Trademark Office ("PTO") has yet to approve registration of these service marks.

BUDDY LISTS® is the brand for a service provided by AOL that provides real-time chat between two or more persons who are simultaneously using the AOL Service. Using this service, members can also learn when pre-selected users are online and available for real-time chat. AOL has been providing this one-to-one real-time chat service continuously since early 1997. AOL and its members call the real-time chat component of the BUDDY LISTS® service the "IM" (pronounced "eye em") feature.

AOL registered its BUDDY LISTS® service mark (U.S.Reg. No. 2,167,048) on the Principal Register of the PTO on June 23, 1998, for computer services; namely, providing multiple user access to computer networks and bulletin boards for the transfer and dissemination of a wide range of information. AOL's BUDDY LISTS® mark has been and continues to be used for this purpose, and the registration remains in full force and effect. IM has not been registered by the PTO.

Defendant AT & T Corp. ("AT & T") provides Internet access to subscribers through its "AT & T WorldNet Service" for a monthly fee, as well. On November 20, 1998, AT & T announced to its AT & T WorldNet beta site members that it was testing an "automatic e-mail notification" feature.

On December 15, 1998, AT & T issued a press release stating that it had "added a You Have Mail! notification window that will pop up whenever a member visits the AT & T WorldNet home page." AT & T's press release also revealed a new "I M Here instant messaging technology ... Members can email the AT & T I M Here instant message software to their friends and then create a buddy list containing the online addresses for these people." AOL learned of AT & T's plan to offer a You Have Mail! branded automatic e-mail notification service and I M Here branded real-time chat service on or about December 15, 1998.

On December 16, 1998, AOL sent an e-mail to AT & T stating: "AOL has been using the YOU HAVE MAIL (word) and YOU'VE GOT MAIL (word and sound) marks for nearly a decade. Applications to register these marks with the PTO and in a number of foreign countries are currently pending. AOL has used these marks as hallmarks of AOL's online service, on a broad range of merchandised products and in connection with Warner Brothers' 'You've Got Mail' movie which is being released this week." This e-mail also expressed AOL's concern over AT &

T's adoption of an I M Here branded real-time chat service.

As of December 17, 1998, AT & T had launched its new automatic e-mail notification service, calling it a You Have Mail! feature. The AT & T web page describing this feature is entitled YOU HAVE MAIL! in large bold print, and the text on this page read: "The 'You Have Mail!' feature provides an automatic e-mail notification when you visit the AT & T WorldNet Service home page. A pop-up window tells you how many messages are in your e-mail inbox and gives you easy access to our web-based e-mail interface. In addition, you're able to access other AT & T WorldNet Service functions and view the latest web site features. Using 'You Have Mail' does not affect your ability to use your e-mail software to download messages whenever you wish." When a user has e-mail, the AT & T pop-up window text reads: "Hi, [NAME]! You have [# ] messages." The pop-up window mentioned by AT & T has a title bar that reads: "AT & T WorldNet Service—You Have Mail." As of December 17, 1998, the public website promotion for the new serviced included the words "You Have Mail!" next to a picture of an old-fashioned U.S. mailbox.

On or before December 17, 1998, AT & T also launched its new real-time chat service, calling it the I M Here service. This service has a buddy list real-time chat component. AT & T's description of its new real-time chat service ("The easiest way to request to add someone to your Buddy List is from an active Community in the I M Here Navigator window") was being made available worldwide via the Internet as of December 17, 1998.

On December 18, 1998, AOL sent a letter, via fax and certified mail, to AT & T, demanding that AT & T cease and desist from using a "You Have Mail!" brand, old-fashioned U.S. mailbox logo, and IM brand in connection with its automatic e-mail notification service and real-time chat service. On December 21, 1998, AOL, having identified what it characterizes as AT & T's "misuse" of AOL's BUDDY LIST® mark, sent another cease and desist letter to AT & T demanding AT & T cease its infringing and diluting use of AOL's BUDDY LIST® mark. On or about December 18, 1998, AT & T removed the old-fashioned U.S. mailbox logo from its "You Have Mail!" feature area of its website. The words "You Have Mail!," used as a brand, remain, as do the IM and BUDDY LIST® brands.

On December 18, 1998, a new Warner Bros. movie entitled "You've Got Mail" opened nationwide. AOL licensed its YOU HAVE MAIL word, YOU'VE GOT MAIL spoken mark, mailbox logo, IM mark, and BUDDY LIST® mark to Warner Bros. for use in connection with this movie. All of these marks are frequently seen and heard in the film.

On December 22, 1998,[1] AOL filed the instant action against AT & T. This is an action against AT & T for its: (a) unauthorized appropriation, use, infringement, blurring and tarnishment of AOL's common-law service marks YOU HAVE MAIL, YOU'VE GOT MAIL, mailbox logo, and IM; and (b) unfair, infringing and diluting uses of AOL's Federally-registered service mark BUDDY LIST®. The Amended Complaint lists seven counts: (1) Federal Trademark Dilution under 15 § U.S.C. 1125(c) (YOU HAVE MAIL, mailbox logo, and YOU'VE GOT MAIL); (2) Federal Trademark Dilution under 15 U.S.C. § 1125(c) (IM and BUDDY LIST®); (3) Trademark Infringement under 15 U.S.C. § 1114 (BUDDY LIST®); (4) Unfair Competition and False Designation of Origin under 15 U.S.C. § 1125(a) (You Have Mail!); (5) Unfair Competition and False Designation of Origin under 15 U.S.C. § 1125(a) (I M Here and Buddy List); (6) Unfair Competition and False Designation of Origin under 15 U.S.C. § 1125(a) (Overall impression); and (7) Interference with Prospective Economic Advantage. AT & T filed an Amended Answer to the Amended Complaint, and filed

---

1. An Amended Complaint was filed on January 19, 1999.

Counterclaims seeking a Declaratory Judgment. In essence, AT & T asks the Court to declare that YOU HAVE MAIL, YOU'VE GOT MAIL, IM, BUDDY LIST®, and the mailbox drawing are generic, and hence not protected trademarks. Also, AT & T asks that the Court declare that AT & T's use of the marks does not create the overall impression that protected marks are being violated.

On December 24, 1998, AOL moved this Court for a Temporary Restraining Order. Both parties submitted briefs and argued, and the Court construed the Motion as one for a Preliminary Injunction. The Court found no likelihood of irreparable harm to AOL if the Preliminary Injunction was not granted, therefore the Court denied AOL's Motion for a Preliminary Injunction. Subsequent to that time the discovery process has continued, and now AT & T moves for summary judgment, urging the Court to find that YOU HAVE MAIL, IM, BUDDY LIST®, YOU'VE GOT MAIL, and the mailbox logo are generic as a matter of law.

### Background

In the late 1960s and early 1970s, AT & T developed UNIX, a computer operating system facilitating communications over the Internet. Once a user connects to UNIX, the UNIX system checks to see if the user has e-mail in an electronic mailbox when the user logs in, and every time a command is executed. Since the 1970s, if the user has e-mail, the system has displayed phrases like "you have mail" or "you have new mail." UNIX continues to be used by individuals who use the computer networks of corporations, universities, and government and research facilities across the country.

Numerous books have described how a computer user is informed that he has e-mail on the UNIX and AOL systems. For example:

* "When you first log into the system, it will inform you if you have any mail (i.e., someone has sent you mail). The system will appear as follows: ... UNIX ... you have mail." RICHARD GAUTHIER, USING THE UNIX SYSTEM, 108 (1981).

* "Accessing Your Mail: Immediately upon logging in, should you have mail, you will see a message indicating: You have mail." PETER M. BIRNS, PATRICK B. BROWN, JOHN C.C. MUSTER, UNIX FOR PEOPLE, 242 (1985).

* "You have two ways to see your new mail. One is pretty obvious ... The obvious one is the big picture button of a hand holding up some letters, emblazoned with the subtle notation You have mail. (I have seen *obvious* before and it looked a lot like this.)" JOHN KAUFELD, AMERICA ONLINE FOR DUMMIES, 99 (1995) (emphasis in original).

* "All you have to do is log on to AOL and, if you have mail, the happy guy that lives inside the AOL program tells you, You have mail (that is, assuming that you have your Mail Sounds turned on in the Member Preference settings)." GENE STEINBERG, USING AMERICA ONLINE WITH YOUR MAC, 70 (1995).

* "When you login your system, you are told whether you have electronic mail waiting for you. If there is mail waiting, you'll see a line like the following: You have mail." KEVIN REICHARD, UNIX: THE BASICS, 160 (2d ed.1998).

* "America Online" announces when you've got mail by saying, "You've got mail!" through your computer's sound card and speakers. It also lets you know you've got mail by way of the mail button on the Welcome screen ... Normally, this button has an envelope for its icon. When you have mail, however, it turns into a mailbox ... *You'll know when you sign on if you have mail[:]* You have mail!" BOB TEMPLE, SAMS' TEACH YOURSELF AMERICA ONLINE 4.0 IN 24 HOURS, 24 (1998) (emphasis in original).

Furthermore, other companies which provide e-mail services have used "You have mail," or a derivation thereof, to notify their customers of the arrival of e-mail messages:

* Since 1993, Prodigy Communications has used the spoken phrase YOU HAVE NEW MAIL in connection with its online service. Prodigy has also used the written phrase YOU HAVE MAIL in the e-mail notification feature of its Internet service, though it no longer does.

* Netcom, an Internet service provider, uses YOU HAVE MAIL to inform users they have e-mail.

* Since the late 1980s, Qualcomm has used YOU HAVE NEW MAIL in its Eudora Pro and Eudora Light e-mail programs to notify users to new e-mail.

* Banyan's Beyond Mail program, used on internal company intranet systems, provides the notice YOU HAVE NEW MAIL whenever a user receives e-mail transmitted internally or over the Internet.

* Care–Mail, a web-based e-mail provider, uses YOU HAVE NEW MAIL to notify users when they have e-mail (and YOU HAVE NO NEW MAIL to inform users when they don't have new e-mail).

* Internet Relay Chat, a software program used by the Internet Relay Network, has used YOU HAVE NEW MAIL as an e-mail alert when a user logs in.

IM, as used by AOL, is an initialism for their "instant message" service. AOL asserts a trademark in IM, not instant message. Despite admonitions from AOL management, AOL employees have used both instant message and IM as nouns and in the plural and possessive forms. Instances include:

* In deposition testimony, an AOL employee referred to an instant message as something sent from one person to another, and admitted to having heard IM used to refer to an instant message.

* An AOL employee saying "send an instant message."

* An AOL employee saying "we put ... the letters IM on the Macintosh tool bar and it blinked to let them know that they had an IM pending."

* In an article, an AOL spokesperson said: "We'll say, 'I IM'ed him, but he never called back.' Or, 'Stop IM'ing me, I'm trying to work.' ... [IM] has become part of the vocabulary."

In its online service and advertising, as well as press releases, AOL has stated:

* "send instant messages;"

* "get instant messages;"

* "send an instant message;" and

* "exchange instant and private messages."

The following are also examples of IM being used by individuals in the Internet community as a substitute for instant message or instant messaging, as well as the definition of instant message found in various books, dictionaries and glossaries:

* Instant message is defined as "instant, private messages" and instant messages are "also called IMs." CHARLES BOWEN, THE HITCHHIKERS GUIDE TO AMERICA ONLINE, 160 (1995).

* "**Instant Message** IM, for short; a message ... delivered instantly, hence the name." JOHN PIVOVARNICK, THE COMPLETE IDIOT'S GUIDE TO AMERICA ONLINE, 315 (1995).

* "**Instant Message (IM)** ... These messages appear almost instantly on the recipient's screen." DEBORAH CRAIG, HOW TO USE AMERICA ONLINE, 225 (4th ed.1999).

* Yahoo! advertises that its pager service provides "IMs."

* In an article pertaining to different instant message programs, it states that a private message is "often called an IM (instant message)." *Well–Mannered Chat,* PC MAGAZINE, Nov. 15, 1998.

* Yahoo! Internet Life published a "Best I.M Systems Guide."

* "Abbreviation ... IM ... What It Means ... Instant Message." MARGARET LEVINE YOUNG, JOHN LEVINE, JORDAN YOUNG, CAROL BAROUDI, THE INTERNET WINDOWS 98 FOR DUMMIES, 254 (1998).

\* **"IM (Instant Message)** A typed message that pops up on the recipient's screen, without the recipient having to check for it as he would have to check for email." EASY INTERNET, 198 (3d ed.1998).

\* **"IM (Instant Message)** Little windows pop onto the monitor screen with messages from friends and strangers. These are known as IMs or Instant Messages." JOHN AND JENNY KAUFELD, AMERICA ONLINE FOR DUMMIES QUICK REFERENCE, 194 (2d ed.1998).

Turning now to BUDDY LIST®, AOL has repeatedly used it as a noun in its online service, instructing users how to "add a screen name to an existing Buddy List;" "remove a screen name from an existing Buddy List;" "create a new Buddy List;" "delete an entire Buddy List," or allow a user to "Edit Buddy Lists." Further, AOL defines "[a] Buddy List [to be] a list of your online friends."

Similar usage of BUDDY LIST® is found in AOL advertisements:

\* In an ad AOL ran on Nickelodeon on January 19, 1999, a child states "I use my Buddy List."

\* In a print ad for their Version 3.0 service, AOL states "Buddy Lists, Hyperlinks and bold new E-mail options keep you in touch ..."

\* In a print ad touting 50 free hours of service plus $20 cash, AOL describes their " 'Buddy Lists' feature that lets you contract friends, family and colleagues ..."

Further, others within the industry routinely use the term BUDDY LIST® list as a synonym for a list of people with whom a user regularly communicates using an instant messaging service. Examples include: SmithMicro's Internet CommSuite product offers a "Buddy List;" Yahoo! Pager features "Buddy Lists;" Freetown's IMN product has "[b]uddy lists;" Matchy is a "buddy-list;" Lagom's Gab! Pager has "The Buddy List;" eShare's InetOne offers customers a "Buddy List" feature; Kid Pager users may add or delete a buddy from their "buddy list;" ComCentral's Hot Messenger claimed to be the world's first free web-based "instant messaging, buddy list and chat system;" Infoseek has cataloged and rated the major "Internet buddy list software web sites;" and the Haddock Directory lists a number of documents relating to "Buddy Lists."

Further evidence of how BUDDY LIST® is used can be found in newspaper and magazine articles. Examples include:

\* "[Yahoo! And GeoCities] will integrate their technologies ... Some of those tools allow users to create buddy lists with their online friends ..." Karen Kaplan & Charles Piller, *Yahoo to Buy GeoCities for $3.9 Billion in Stock*, L.A. TIMES, January 29, 1999.

\* "Marty Toucher, director of network communication at [the Microsoft Network], said that as soon as MSN rolls out services like instant messaging and chat buddy lists, they will be available on AltaVista." Malcolm Maclachlan, *Alta Vista Deal Adds Twist to Portal Wars*, CMP TECHWEB, January 26, 1999.

\* "[Talk City's EZ Talk Pro] offers ... handy features such as buddy lists, which tell you when friends come online[.]" *Jumping into Online Chat*, PC MAGAZINE, November 15, 1998.

\* "A beta version of AOL Instant Messenger for Windows, which now lets you send files to people on your buddy list ..." *Technology*, HOUSTON CHRONICLE, April 16, 1999.

\* "Jennie already has 28 friends on her AOL Buddy List ..." Karen Thomas, *The Family Circuits*, USA TODAY, April 14, 1999.

\* "Buddy List and Chat programs such as ICQ and Yahoo! Pager were never designed for secure communications ..." Babychen Mathew, *Is your PC being hacked?*, BUSINESS STANDARD, April 10, 1999.

\* "MicroSoft Internet Explorer users can also manage their clubs and buddy lists directly from their desktop." Kipp

Cheng, *Lycos Launches "Sticky" Clubs,* ADWEEK, April 5, 1999.

Examples of how BUDDY LIST® is used in reference books include:

\* **"buddy lists** Lists you create of people you know or chat with regularly. The feature can automatically tell you if any of your buddies are online at a given time." DAVID KRASSNER, THE ABCs OF AMERICA ONLINE, 352 (1996).

\* **"Buddy Lists** The Buddy List feature is like the Locate Member feature on steroids. Your buddy list contains the screen names of individuals with whom you like to chat, exchange instant messages, and otherwise communicate online. The main function of this feature is to inform you whenever someone on one of your lists signs on or signs off." DAVID KRASSNER, THE ABCs OF AMERICA ONLINE 3 FOR WINDOWS 95, 174 (1997).

\* **"Your Buddy List** Your Buddy List is the easiest way to tell whether a cherished friend is online and thus available for instant messaging." LAURA ARENDAL, SYBEX's AMAZING SECRETS AMERICA ONLINE, 53 (1998).

\* "Why not set [your e-mail system] up so that AOL automatically notifies you with a beep each time one of your buddies signs on? That way you can exchange Instant Messages and maybe get together in a chat room. All you have to do to set this up is create a Buddy List . . ." DAVID EINSTEIN, AMERICA ONLINE FOR BUSY PEOPLE, 132 (1996).

\* "The Buddy List tells you at a glance which of your friends are online." JOHN KAUFELD, AMERICA ONLINE FOR DUMMIES (4th ed.1998).

### Arguments

AT & T argues that this case should be resolved now on summary judgment because the law precludes AOL from appropriating the generic, common English language expressions "you have mail," "IM," "buddy list," and "you've got mail." AT & T says that these four terms are exemplars of generic expressions. They are the clearest and the preferred words commonly used to describe the event or function; they are in widespread use, and they are used as generic expressions by the public, the media, AOL's competitors, and AOL itself. The terms have been used universally on the Internet for as long as the actions or services they describe have existed (in the case of YOU HAVE MAIL, for over 20 years). AT & T argues that AOL cannot obtain a legal monopoly over the words necessary to describe either events or services. YOU HAVE MAIL and YOU'VE GOT MAIL are notifications that an Internet e-mail user has e-mail, and are displayed/mentioned—for example by AOL — only when you have e-mail. IM is the common initialization for instant message — a message that may be sent instantly between two Internet users who are simultaneously online. Similarly, a BUDDY LIST® lists the names of online "buddies" to whom you send instant messages. No single company can appropriate the exclusive use of these generic, common expressions.

AOL responds that under settled case law, whether a trademark is generic is strictly a question of fact which can be resolved on summary judgment only if there are no disputes about the material facts. AOL says that the real test of whether marks are generic is whether competitors would be "rendered speechless" without the ability to use the terms. Because AT & T itself weighed more than 100 available names for its services before it decided to infringe YOU HAVE MAIL, YOU'VE GOT MAIL, IM, and BUDDY LIST®, and because other competitors have found it easy to use non-infringing terms to describe their services, AOL maintains that not only is summary judgment in favor of AT & T inappropriate, but that as a matter of law AOL should be entitled to summary judgment. It is AOL's contention that YOU HAVE MAIL, YOU'VE GOT MAIL and BUDDY LIST® are suggestive marks, and that IM is an arbitrary mark, all entitled to the full protection of the Lanham Act.

### Standard for Summary Judgment

Summary judgment is appropriate when there is no genuine issue as to any material fact. *See* FED.R.CIV.P. 56(c). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the nonmoving party. *See id.* Unsupported speculation is not enough to withstand a motion for summary judgment. *See Ash v. United Parcel Serv., Inc.,* 800 F.2d 409, 411–12 (4th Cir.1986). Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). When a motion for summary judgment is made, the evidence presented must always be construed in the light most favorable to the nonmoving party. *See Smith v. Virginia Commonwealth Univ.,* 84 F.3d 672, 675 (4th Cir.1996) (*en banc*).

### The Lanham Act

■ Federal trademark law is governed by the Lanham Act, 15 U.S.C. § 1051, *et seq.,* a comprehensive trademark protection statute enacted in 1946. Ted Curtis & Joel H. Stempler, *So What Do We Name the Team? Trademark Infringement, the Lanham Act and Sports Franchises,* 19 Colum.–VLA J.L. & Arts 23 (1995). A trademark is defined to include "any word, name, symbol, or device, or any combination thereof ... used ... to identify and distinguish his or her goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. The purpose of the Lanham Act is to allow those who place their goods and services into the marketplace to distinguish such goods and services from those of their competitors. Stephen R. Baird, *Putting the Cart Before the Horse in Assessing Trademark Validity—Toward Redefining the Inherently Generic Term,* 14 J. Corp. L. 925, 926 (1989). In essence, since trademarks and service marks are source-identifying, their purpose is to answer the questions "Who are you?" and "Where do you come from?". *See* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 12:1 at 12–4 (4th ed.1998) (hereinafter [# ] "McCarthy").

When a service mark is registered on the PTO's Principal Register, this is *prima facie* evidence of "the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the registration[.]" 15 U.S.C. § 1115(a). Furthermore, trademarks and service marks not registered with the PTO may come under the protection of the Lanham Act. *See* 15 U.S.C. § 1125; *see also Perini Corp. v. Perini Const., Inc.,* 915 F.2d 121, 124 (4th Cir. 1990). The Lanham Act protects certain unregistered marks when a person "uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion." 15 U.S.C. § 1125(a)(1)(A).

■ Courts have categorized marks into four classes: (1) fanciful or arbitrary; (2) suggestive; (3) descriptive; and (4) generic. *See Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1527 (4th Cir.1984); *see also Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2nd Cir.1976).

"The protection accorded trademarks is directly related to the mark's distinctiveness." *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 464 (4th Cir.1996). Fanciful marks are made-up words which serve as a product's brand name.[2] *See id.* Fanciful marks are inherently distinctive, thus receiving the greatest protection against infringement. *See id.* (citing 1 J. McCarthy, § 11.01[1] ).

■ Arbitrary marks are common words used in a manner which do not suggest or describe any "quality, ingredient, or characteristic of the goods they serve...".[3] *Id.* Like fanciful marks, arbitrary marks are also inherently distinctive, receiving the fullest protection against infringement which the Lanham Act has to offer. *See id.*

■ "Suggestive marks connote, without describing, some quality, ingredient, or characteristic of the product."[4] *Id.* While these marks conjure up positive images, courts consider these marks suggestive because "a person without actual knowledge would have difficulty in ascertaining the nature of the products that the marks represent." *Id.* Suggestive marks, too, are inherently distinctive and fully protected by the Lanham Act. *See id.*

■ Descriptive marks, which are not inherently distinctive, are those which identify some function, use, characteristic, size or intended purpose of the product.[5] *See id.* In order for a descriptive mark to be accorded protection, it must be shown that it has acquired what is known as "secondary meaning." *See id.* Secondary meaning is shown where "if 'in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself.'" *Id.* (citing *Dayton Progress Corp. v. Lane Punch Corp.*, 917 F.2d 836, 839 (4th Cir.1990)).

■ Generic marks are the last, and by far most important for purposes of this Memorandum Opinion, category. A mark is generic when it "identifies a class of product or service, regardless of source[.]" *Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir.1996); *see also Abercrombie & Fitch*, 537 F.2d at 9 ("A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species"); *Blinded Veterans Ass'n v. Blinded Am. Veterans Found.*, 872 F.2d 1035, 1039 (D.C.Cir.1989) ("A generic term is one commonly used to denote a product or other item or entity, one that indicates the thing itself, rather than any particular feature or exemplification of it"); *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.*, 561 F.2d 75, 79 (7th Cir.1977), *cert. denied*, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 ("[A] generic or common descriptive term is one which is commonly used as the name or description of a kind of goods"); *S.S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir.1979) ("Generic terms are those which refer to a genus of which a particular product is a species, without distinguishing its source or origin"); *Surgicenters of Am., Inc. v. Medical Dental Surgeries, Co.*, 601 F.2d 1011, 1014 (9th Cir.1979) ("A 'generic' term is one that refers, or has come to be understood as referring, to the genus of which the particular product or service is a species"); *Convenient Food Mart, Inc. v. 6–Twelve Convenient Mart, Inc.*, 690 F.Supp. 1457, 1460 (D.Md.1988), *aff'd by unpublished opinion*, 870 F.2d 654 (4th Cir.1989). Rather than answering the questions "Who are you?" and "Where do you come from?," generic marks tell the buyer what the product is. 1 J. McCarthy, 405–6.

■ Generic marks never qualify for the protections of the Lanham Act; are

---

**2.** Examples include Clorox®, Kodak®, Polaroid®, and Exxon®.

**3.** Examples include Tea Rose® flour, Camel® cigarettes, and Apple® computers.

**4.** Examples include Coppertone®, Orange Crush®, and Playboy®.

**5.** Examples include After Tan post-tanning lotion, 5 Minute glue, King Size men's clothing, and the Yellow Pages telephone directory.

not registrable; and a registered mark can be canceled at any time upon a finding that the mark is, or has become, generic. *See* 15 U.S.C. §§ 1052, 1064(3); *see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 661, 83 L.Ed.2d 582 (1985); *Glover,* 74 F.3d at 59; *Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 143 (2nd Cir.1997); *S.S. Kresge Co.,* 598 F.2d at 696; *Abercrombie & Fitch,* 537 F.2d at 9. A generic mark cannot receive trademark protection because "generic" and "trademark" are mutually exclusive terms. *BellSouth Corp. v. White Directory Publishers, Inc., 42 F.Supp.2d 598* (M.D.N.C.1999) (citing 2 J. McCarthy § 12:1 at 12–4). Trademarks are used to distinguish a producer's goods and services from those of his competitors, while generic terms denote the product and the service itself, rather than the source, so they are in no way distinctive of the goods and services to which they are applied. *See* Baird, 14 J. Corp. L. at 926–28.

■ Further, even if a producer or provider has achieved secondary meaning in its generic mark through promotion and advertising, the generic mark is still not entitled to protection because to allow protection would "deprive competing manufacturers of the product of the right to call an article by its name." *See Abercrombie & Fitch,* 537 F.2d at 9; *see also Genesee Brewing Co.,* 124 F.3d at 143 n. 4; *Keebler Co. v. Rovira Biscuit Corp.,* 624 F.2d 366, 374 (1st Cir.1980) ("No amount of purported proof that a generic term has acquired secondary meaning associating it with a particular producer can transform that term into a registrable trademark"); *Reese Publishing Co., Inc. v. Hampton Intern. Communications,* 620 F.2d 7, 12 n. 2 (2nd Cir.1980) (Evidence of secondary meaning "at most could have established 'de facto secondary meaning,' which cannot suffice to convert a generic term into a trademark"); *Surgicenters,* 601 F.2d at 1016 (A generic word "cannot be validly registered as a trademark even if there is proof of secondary meaning").

■ "The existence of synonyms for a term does not mean the term is not generic. There may be more than one term which the consuming public understands as designating a category of goods." *Loctite Corp. v. National Starch and Chemical, Corp.,* 516 F.Supp. 190, 201 (S.D.N.Y. 1981) (holding that "Super Glue," "Instant Glue," and "Ten Second Glue" are all generic); *see also Blinded Veterans Ass'n,* 872 F.2d at 1041 ("A term need not be the sole designation of an article in order to be generic"); 1 McCarthy § 12:2 at 525–26; *accord S.S. Kresge Co.,* 598 F.2d at 696; *Convenient Food Mart,* 690 F.Supp. at 1462.

■ Also, when a common English word is used as a mark for its ordinary meaning, it cannot be appropriated for exclusive use because the mark is generic. *See Wynn Oil Co. v. Thomas,* 839 F.2d 1183, 1190 n. 4 (6th Cir.1988) ("[T]he significant factor is not whether the word itself is common, but whether the way the word is used in the particular context is unique enough to warrant trademark protection"); *see also, Blinded Veterans Ass'n,* 872 F.2d at 1041–42 (based on plain meaning of the words "blinded" and "veteran," the phrase "Blinded Veterans" is generic for an association of once-sighted persons who served in the military); *CES Publishing Corp. v. St. Regis Publications, Inc.,* 531 F.2d 11 (2nd Cir.1975) ("Consumer Electronics" is generic for electronic equipment purchased and installed by consumers and, therefore, "Consumer Electronics Monthly" is generic as a mark for a magazine title).

■ Context is also important in examining a combination of common words for their combined ordinary meaning. Considering the phrase in its entirety does not preclude the Court from examining whether the combined words simply convey a combination of each word's everyday common meaning. *See Genesee Brewing Co.,* 124 F.3d at 140–41 ("honey" added to "brown ale" is the generic "honey brown" ale).

To prevail on a trademark infringement claim under § 1125 (for unregistered service marks), a plaintiff must both demonstrate "(1) that it has a valid and protectible [mark] and (2) that the defendant's use of the mark in question creates a likelihood of consumer confusion." *BellSouth,* 42 F.Supp.2d at 606 (citing *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,* 43 F.3d 922, 930 (4th Cir.1995)). While the question of the validity of the mark, i.e., whether the mark is generic, is one of fact, summary judgment is nevertheless appropriate "if the evidence is so one-sided that there can be no doubt about how the question should be answered." *Id.* at 606 (quoting *Door Sys., Inc. v. Pro-Line Door Sys., Inc.,* 83 F.3d 169, 171 (7th Cir.1996)); *see also Convenient Food Mart,* 690 F.Supp. at 1461. In a case, like the instant case, where the proponent of the validity of unregistered mark has been confronted with a motion for summary judgment based on the genericness of the mark, the burden is on the proponent to "demonstrate that the symbol is not generic and thus that it is a valid and protectible mark." *BellSouth,* at 606–07 (citing *Blinded Veterans Ass'n,* 872 F.2d at 1041).

The initial issue the Court must consider is into which of the four categories does the mark fit. *See Blinded Veterans Ass'n,* 872 F.2d at 1041. It has been said that "the lines of demarcation between the four classes ... are not always bright." *Reese Publishing,* 620 F.2d at 10. To assist the Court in shedding some light on the lines of demarcation and determining whether the marks are generic, the Court is to employ what is known as the "primary significance" test. *See Glover,* 74 F.3d at 59.

The primary significance test was first adopted by the Supreme Court in *Kellogg Co. v. National Biscuit Co.,* 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938). Under this test, a plaintiff who is seeking to establish a valid trademark must show "that the primary significance of the term in the minds of the consuming public is not the product but the producer." *Id.* McCarthy recommends the following evidence to be used to determine the primary significance of a mark: (1) competitors' use of the mark, (2) plaintiff's use of the mark, (3) dictionary definitions, (4) media usage, (5) testimony of persons in the trade, and (6) consumer surveys. 2 McCarthy 12:13 at 12–26 to 12–34.

For marks which have been registered, § 1057 provides the registrant of the mark with a presumption that the mark·is valid, owned by the registrant, and that the registrant has an exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate. 15 U.S.C. § 1057(b). Hence, a party seeking cancellation of the mark due to genericness has the burden of establishing that fact by a preponderance of the evidence. *See Glover,* 74 F.3d at 59.

*Discussion*

A. YOU HAVE MAIL

As previously stated, AT & T considers YOU HAVE MAIL to be generic, while AOL argues it is a protectible, suggestive mark. Since YOU HAVE MAIL is not a registered mark, AOL bears the burden of proving that the mark is not generic. *See BellSouth,* at 606–07.

AOL argues that a mark is not generic when there are other ways for the alleged infringer to characterize his goods or services without using the plaintiff's mark. AOL cites *CES Publishing,* 531 F.2d 11 (2nd Cir.1975) and *Committee for Idaho's High Desert, Inc. v. Yost,* 92 F.3d 814 (9th Cir.1996), for this proposition. Because there are innumerable ways to identify the types of service at issue here, AOL argues AT & T has not been "rendered speechless" by AOL's use of the YOU HAVE MAIL mark. Because other alternatives are readily available to AT & T, YOU HAVE MAIL cannot be considered a generic mark.

In its brief, AOL cites the language of *CES Publishing* holding that "[t]o allow trademark protection for generic terms ... would grant the owner of the mark a monopoly, since a competitor could not describe his goods as what they are." 531 F.2d at 13. AOL concludes that this language stands for the proposition that as long as alternatives are available, the disputed mark must not be generic.

In *CES Publishing* the Court of Appeals held that the phrase "Consumer Electronics" was generic as applied to periodicals. *Id.* The Court, though, did not hold that as long as competitors had alternative product/service names available, then the marks in question were not generic. To the contrary, the Court applied the "genus/species" test and held that allowing trademark protection for a term which specified a genus would be to "grant the owner of the mark a monopoly." *Id.*

AOL relies on *The Committee for Idaho's High Desert* as supporting their "rendered speechless" argument. In that case, a pro-environment group had incorporated under the name "The Committee for Idaho's High Desert" ("CIHD"). *Id.* at 817. However, due to a failure to file a required annual report, the group lost its incorporation under Idaho law, meaning that any group could then incorporate under the name CIHD. *Id.* Unbeknownst to the original founders of CIHD, a group of ranchers and others alleged to be not so environmentally friendly, incorporated themselves as CIHD. *Id.* The founders of the original CIHD then filed a Lanham Act suit against the second users of the name. The Court of Appeals upheld the District Court's finding that the name CIHD was not generic because it was not difficult for the alleged infringers to envision another term with reasonable conciseness and clarity by which they could refer to their group. *Id.* at 822.

The Court notes, however, that like in *CES Publishing*, in *The Committee for Idaho's High Desert* the Court employed the genus/species test to reach their ultimate finding. *Id.* at 821–22. What the Court does, though, is to define genus in such a way that it begins to resemble a "rendered speechless" analysis. *Id.* at 822.

■ The weight of the authority clearly shows, however, that the Court's primary concern should not be the availability of alternative terms, but rather whether the term/phrase is generic under the primary significance test. *See S.S. Kresge Co.*, 598 F.2d at 696 ("The question, however, is not whether a term is more frequently chosen colloquially than any of its synonyms, but whether it still retains its generic meaning"); *see also Kellogg*, 305 U.S. at 118, 59 S.Ct. at 113.

As stated previously, a term is generic when it describes the genus of which the product belongs to the species. *See Glover*, 74 F.3d at 59; *see also Abercrombie & Fitch*, 537 F.2d at 9 ("A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species"); *Blinded Veterans Ass'n*, 872 F.2d at 1039 ("A generic term is one commonly used to denote a product or other item or entity, one that indicates the thing itself, rather than any particular feature or exemplification of it"); *Miller Brewing Co.*, 561 F.2d at 79 ("[A] generic or common descriptive term is one which is commonly used as the name or description of a kind of goods"); *S.S. Kresge Co.*, 598 F.2d at 696 ("Generic terms are those which refer to a genus of which a particular product is a species, without distinguishing its source or origin"); *Surgicenters*, 601 F.2d at 1014 ("A 'generic' term is one that refers, or has come to be understood as referring, to the genus of which the particular product or service is a species"); *Convenient Food Mart*, 690 F.Supp. at 1460, *aff'd by unpublished opinion*, 870 F.2d 654 (4th Cir. 1989). To determine whether the primary significance of a mark is generic, the Court should consider the following: (1) competitors' use of the mark, (2) plaintiff's use of the mark, (3) dictionary definitions, (4) media usage, (5) testimony of persons in the

trade, and (6) consumer surveys. 2 McCarthy 12:13 at 12–26 to 12–34.

Besides the availability of alternatives test, AOL attempts to prove that YOU HAVE MAIL is not generic by relying on portions of the primary significance test. Specifically, AOL brings to the Court's attention the fact that 24 out of 26 (or 92%) of the general dictionaries of the English language that have been adduced by the parties do not mention "electronic mail" or "e-mail" anywhere in their definitions of the word "mail." Indeed, even the two which do mention "e-mail" or "electronic mail" only do so as part of a third or fifth-rank definition of the word "mail," far behind the universally understood primary definition of the word. AOL argues that the mark YOU HAVE MAIL is suggestive, because they chose to use "mail" in the mark rather than the technically correct terms "e-mail" or "message" as a way of fitting with their overall strategy of developing a unique and friendly online experience. The suggestive analogy between electronic messages and "mail" was then further bolstered by AOL's use of a graphic featuring an old-fashioned mailbox with a red flag.

The Court finds this argument unpersuasive. The record is so replete with instances of "mail" and "e-mail" being used interchangeably that the Court is able to glean the true meaning of "mail" as it is used in YOU HAVE MAIL. Under the primary significance test, the "mail" component of YOU HAVE MAIL means "e-mail."

First, the Court notes that even AOL uses the words "mail" and "e-mail" interchangeably. For example, in its Amended Complaint AOL repeatedly uses the word "mail" as referring to "e-mail" ("This same audio and visual display repeats itself whenever the member receives additional new mail during the course of an online session." Amended Complaint, at 4; "When a user has mail, the AT & T pop-up window text reads ..." Amended Complaint, at 9). While AOL contends YOU HAVE MAIL is suggestive because the "mail" component means something other than e-mail, this contention is belied by their use of "mail" to mean "e-mail." As the plaintiff's use of the mark is a factor to be considered under the primary significance test, the Court finds this fact important.

Next, it is undisputed that numerous competitors of AOL use "mail" as a synonym for "e-mail." As previously stated, Prodigy Communications (YOU HAVE NEW MAIL) (spoken) and YOU HAVE MAIL (written), Netcom (YOU HAVE MAIL), Qualcomm (YOU HAVE NEW MAIL), Banyan (YOU HAVE NEW MAIL), Care–Mail (YOU HAVE NEW MAIL/YOU HAVE NO NEW MAIL), and Internet Relay Chat (YOU HAVE NEW MAIL) have all used "mail" as a substitute for "e-mail."

Regarding media usage and testimony of persons involved in the trade, this Memorandum Opinion contains numerous examples of the books printed to describe the e-mail notification features used by both UNIX and AOL. All of the authors, without fail, use "mail" and "e-mail" interchangeably. *See* Gauthier, *supra*, at 108 ("When you first log into the system, it will inform you if you have any mail (i.e., someone has sent you mail). The system will appear as follows: ... UNIX ...you have mail"); *see also* Birns, Brown and Muster, *supra*, at 242 ("Accessing Your Mail: Immediately upon logging in, should you have mail, you will see a message indicating: You have mail"); Kaufeld, *supra*, at 99 ("You have two ways to see your new mail. One is pretty obvious ... The obvious one is the big picture button of a hand holding up some letters, emblazoned with the subtle notation You have mail. (I have seen *obvious* before and it looked a lot like this)" (emphasis in original)); Steinberg, *supra*, at 70 ("All you have to do is log on to AOL and, if you have mail, the happy guy that lives inside the AOL program tells you, You have mail (that is, assuming that you have your Mail Sounds turned on in the Member Preference settings)");

Reichard, *supra*, at 160 ("When you login your system, you are told whether you have electronic mail waiting for you. If there is mail waiting, you'll see a line like the following: You have mail"); Temple, *supra*, at 24 ("America Online" announces when you've got mail by saying, "You've got mail!" through your computer's sound card and speakers. It also lets you know you've got mail by way of the mail button on the Welcome screen ... Normally, this button has an envelope for its icon. When you have mail, however, it turns into a mailbox ... *You'll know when you sign on if you have mail[:]* You have mail!" (emphasis in original)). This usage, too, supports the conclusion that "mail," as used by AOL in YOU HAVE MAIL, in reality stands for "e-mail," not something else.

Last, the Court would note that McCarthy recommends using consumer surveys as a means of determining whether the primary significance of a mark is generic. *See* 2 McCarthy 12:13 at 12–26 to 12–34. However, when determining whether a mark is generic, the Court is not to consider whether the mark has acquired any secondary meaning, because generic marks with secondary meaning are still not entitled to protection. To allow protection would "deprive competing manufacturers of the product of the right to call an article by its name." *See Abercrombie & Fitch*, 537 F.2d at 9; *see also Genesee Brewing Co.*, 124 F.3d at 143 n. 4; *Keebler Co.*, 624 F.2d at 374 ("No amount of purported proof that a generic term has acquired secondary meaning associating it with a particular producer can transform that term into a registrable trademark"); *Reese Publishing*, 620 F.2d at 12 n. 2 (evidence of secondary meaning "at most could have established 'de facto secondary meaning,' which cannot suffice to convert a generic term into a trademark"); *Surgicenters*, 601 F.2d at 1016 (a generic word "cannot be validly registered as a trademark even if there is proof of secondary meaning").

If a term is generic, then regardless of whether one particular company or individual has succeeded in having the public think of that company/individual when they think of the term, the term nonetheless describes a genus, when the purpose of trademarks is to describe the species.

The undisputed facts establish that AOL uses the YOU HAVE MAIL mark generically. AOL uses YOU HAVE MAIL to inform users of the fact that they have e-mail, which is also known as mail. When a common word or phrase is used as a mark for its ordinary meaning, the mark is generic. *See Wynn Oil Co.*, 839 F.2d at 1190 n. 4. YOU HAVE MAIL disappears from the screen when a user has no new e-mail. If the phrase YOU HAVE MAIL was truly intended to be used as something akin to a trademark, the phrase would not appear and disappear depending upon the user's mailbox status. Given the context in which AOL uses the mark, the mark is generic. This finding is also supported by the use of "mail" by AOL's competitors, the media and persons involved in the industry.

The primary significance of the phrase YOU HAVE MAIL indicates to the public-at-large what the service is, not where it came from. The "mail" in YOU HAVE MAIL refers to e-mail, which is a genus, not a species. Further, this holding does not rest on considering solely the "mail" component of the phrase YOU HAVE MAIL. As McCarthy instructs, a trademark should be considered as a whole when determining whether or not the mark is generic. 1 McCarthy § 11: 10 at 364–66; *see also Reese Publishing Co.*, 620 F.2d at 11 n. 1. The "you" and the "have" of YOU HAVE MAIL (either separately or together) do not carry with them any especial significance which would change the primary significance of the mark as previously stated. *See Genesee Brewing Co.*, 124 F.3d at 140–41. Since the "you," "have," and "mail" of YOU HAVE MAIL are all used for their everyday, common meaning, the phrase as a whole is generic, and summary judgment in favor of AT & T is appropriate.

## B. IM

■ The Court now turns its attention to the issue of IM. AOL asserts that IM is an arbitrary mark. All AOL must do at this juncture is "demonstrate that the symbol is not generic and thus that it is a valid and protectible mark." *BellSouth,* at 606–07. AOL again applies their "rendered speechless" argument to prove the mark is not generic. However, the Court is to apply the primary significance test.

It is well-settled that an abbreviation of a generic name that continues to convey to consumers the original generic connotation of the unabbreviated name is also generic. *See National Conference of Bar Examiners v. Multistate Legal Studies, Inc.,* 692 F.2d 478, 488 (7th Cir.1982). While acronyms or initials can be entitled to protection if they are descriptive, *see American Historic Racing Motorcycle Ass'n v. Team Obsolete Promotions,* 33 F.Supp.2d 1000 (M.D.Fla.1998), if the initials have become so generally understood as being substantially synonymous with the words they represent, they are not protectible. *See Modern Optics, Inc. v. Univis Lens Co.,* 43 C.C.P.A. 970, 234 F.2d 504, 506 (1956).

In applying the primary significance test, the Court has little trouble determining that IM is generic and not protected by the Lanham Act. The record indicates that AOL and AOL employees frequently use IM in a manner which indicates that it is a noun, not an adjective (an AOL employee stating "we put ... the letters IM on the Macintosh tool bar and it blinked to let them know that they had an IM pending"; in an article, an AOL spokesperson said: "We'll say, 'I IM'ed him, but he never called back'; or, 'Stop IM'ing me, I'm trying to work' ... [IM] has become part of the vocabulary"; in its online service and advertising, as well as press releases, AOL has stated "send instant messages," "get instant messages," "send an instant message," and "exchange instant and private messages").

Concerning how IM is used by AOL's competitors; how IM is defined in dictionaries; and how it is used by the media and other persons in the Internet community, the record is also rife with examples of how IM is used by others to stand for exactly what it means. *See* Bowen, *supra,* at 160 (instant message is defined as "instant, private messages" and instant messages are "also called IMs"); *see also* Pivovarnick, *supra,* at 315 ("Instant Message IM, for short; a message ... delivered instantly, hence the name"); Craig, *supra,* at 225 ("Instant Message) (IM) ... These messages appear almost instantly on the recipient's screen"; Yahoo! advertises that its pager service provides "IMs"; *Well–Mannered Chat,* PC MAGAZINE, Nov. 15, 1998, at 30 (in an article pertaining to different instant message programs, it states that a private message is "often called an IM (instant message))"; Yahoo! Internet Life published a "Best I.M Systems Guide"; Young, Levine, Young and Baroudi, *supra,* at 254 "Abbreviation ... IM ... IM ... What It Means ... Instant Message"; EASY INTERNET, *supra,* at 198 ("**IM (Instant Message)** A typed message that pops up on the recipient's screen, without the recipient having to check for it as he would have to check for email"); John and Jenny Kaufeld, *supra,* at 194 ("**IM (Instant Message)** Little windows pop onto the monitor screen with messages from friends and strangers. These are known as IMs or Instant Messages"). The conclusion is that IM stands for "instant message" (as AOL admits), and because the primary significance of "instant message" is to stand for an "instant message," the term IM reflects the genus, not the species. Accordingly, summary judgment in favor of AT & T is appropriate as IM is generic.

## C. BUDDY LIST®

■ BUDDY LIST® received registration from the PTO without proof of secondary meaning. This fact creates a presumption that the mark is suggestive, and a strong presumption that the mark is valid. *See Pizzeria Uno,* 747 F.2d at 1529; *see also* 15 U.S.C. 1057(b). Hence, the burden, by a preponderance of the evi-

dence, is on AT & T to prove that the mark is generic. *See Glover,* 74 F.3d at 59.

■ AT & T notes, notwithstanding the above, that registered marks are regularly held invalid and canceled if generic. *See Miller Brewing Co. v. Jos. Schlitz Brewing Co.,* 605 F.2d 990 (holding that the term "light" or "Lite" is generic for beer, thus allowing for the mark's cancellation). Further, Courts have found that it is appropriate to cancel registered marks on motions for summary judgment. *See Convenient Food Mart,* 690 F.Supp. at 1461. Because AOL, AOL's competitors, the media and reference books use BUDDY LIST® as a common, generic term to describe a particular feature of service, AT & T argues that BUDDY LIST® is not entitled to trademark protection.

First, AT & T points to AOL's use of BUDDY LIST® as a noun, in the plural and possessive forms ("add a screen name to an existing Buddy List;" "remove a screen name from an existing Buddy List;" "create a new Buddy List;" "delete an entire Buddy List," or allow a user to "edit Buddy Lists;" and "[a] Buddy List [is] a list of your online friends"). Under the primary significance test, the use of the mark by the owner is probative of whether the mark is generic. Further, AT & T points to the advertising efforts of AOL, including the print and television advertising mentioned previously in this Memorandum Opinion. AT & T argues that AOL itself uses BUDDY LIST® as a generic term.

Also, AT & T argues that the competitors of AOL use BUDDY LIST® as a synonym for a list of people with whom a user regularly communicates using an instant messaging service, further supporting their argument that under the primary significance test the term is generic. Examples include: SmittMicro's Internet CommSuite product offers a "Buddy List"; Yahoo! Pager features "Buddy Lists"; Freetown's IMN product has "[b]uddy lists"; Matchy is a "buddylist"; Lagom's Gab! Pager has "The Buddy List"; eS-

hare's InetOne offers customers a "Buddy List" feature; Kid Pager users may add or delete a buddy from their "buddy list"; ComCentral's Hot Messenger claimed to be the world's first free web-based "instant messaging, buddy list and chat system"; Infoseek has cataloged and rated the major "Internet buddy list software web sites"; and the Haddock Directory lists a number of documents relating to "Buddy Lists." Again, as use of a mark by those who are competitors of the plaintiff, and those in the Internet community, is probative of whether or not BUDDY LIST® is generic, AT & T argues that the above evidence should assist the Court in deciding that BUDDY LIST® is generic as applied to AOL's real-time chat feature as a matter of law.

AT & T points to the media's use of BUDDY LIST® since this, too, is part of the primary significance test equation. Examples include:

* "[Yahoo! And GeoCities] will integrate their technologies ... Some of those tools allow users to create buddy lists with their online friends ..." Karen Kaplan & Charles Piller, *Yahoo to Buy GeoCities for $3.9 Billion in Stock,* L.A. TIMES, January 29, 1999.

* "Marty Toucher, director of network communication at [the Microsoft Network], said that as soon as MSN rolls out services like instant messaging and chat buddy lists, they will be available on AltaVista." Malcolm Maclachlan, *AltaVista Deal Adds Twist to Portal Wars,* CMP TECHWEB, January 26, 1999.

* "[Talk City's EZ Talk Pro] offers ... handy features such as buddy lists, which tell you when friends come online[.]" *Jumping into Online Chat,* PC MAGAZINE, November 15, 1998.

* "A beta version of AOL Instant Messenger for Windows, which now lets you send files to people on your buddy list ..." *Technology,* HOUSTON CHRONICLE, April 16, 1999.

* "Jennie already has 28 friends on her AOL Buddy List ..." Karen Thom-

as, *The Family Circuits*, USA TODAY, April 14, 1999.

\* "Buddy List and Chat programs such as ICQ and Yahoo! Pager were never designed for secure communications ..." Babychen Mathew, *Is your PC being hacked?*, BUSINESS STANDARD, April 10, 1999.

\* "MicroSoft Internet Explorer users can also manage their clubs and buddy lists directly from their desktop." Kipp Cheng, *Lycos Launches "Sticky" Clubs*, ADWEEK, April 5, 1999. AT & T argues that all of this proves that the mark BUDDY LIST® is, in reality, a generic mark which should be canceled.

Last, AT & T cites how BUDDY LIST® is used in reference books:

\* "**buddy lists** Lists you create of people you know or chat with regularly. The feature can automatically tell you if any of your buddies are online at a given time." Krassner, THE ABCs OF AMERICA ONLINE, at 352.

\* "**Buddy Lists** The Buddy List feature is like the Locate Member feature on steroids. Your buddy list contains the screen names of individuals with whom you like to chat, exchange instant messages, and otherwise communicate online. The main function of this feature is to inform you whenever someone on one of your lists signs on or signs off." Krassner, THE ABCs OF AMERICA ONLINE 3 FOR WINDOWS 95, at 174.

\* "**Your Buddy List** Your Buddy List is the easiest way to tell whether a cherished friend is online and thus available for instant messaging." Arendal, *supra*, at 53.

\* "Why not set [your e-mail system] up so that AOL automatically notifies you with a beep each time one of your buddies signs on? That way you can exchange Instant Messages and maybe get together in a chat room. All you have to do to set this up is create a Buddy List ..." Einstein, *supra*, at 132.

\* "The Buddy List tells you at a glance which of your friends are online." Kaufeld, *supra.*

All of the above indicates to AT & T that summary judgment is appropriate.

AOL responds that the mark BUDDY LIST® is plainly suggestive. The online users with whom one may engage in real-time chat are not necessarily "buddies" or friends at all: they may be business colleagues, family members, or even adverse parties. Moreover, the words "buddy" and "list" do not convey, separately or together, the complex functionality that the BUDDY LIST® feature provides.

Further, AOL notes that the newspaper articles cited by AT & T as purported evidence of allegedly routine or common usage of BUDDY LIST® as a genetic term not only do not support AT & T's point, but actually help prove that BUDDY LIST® is a protected trademark. Many of the articles that AT & T cites, as well as many that it does not cite, use BUDDY LIST® in a manner that is specifically and uniquely associated with AOL. Many other articles AT & T cites use BUDDY LIST® in a manner that is specifically associated with entities that AOL has sued to stop such use, or who have agreed to cease such use following complaints from AOL. Similarly, of the reference books and manuals that AT & T submits reflecting usage of BUDDY LIST®, two-thirds are specifically devoted to discussing the AOL Service or otherwise use the term in a manner uniquely associated with AOL.

While it is true that there is some evidence in the record that BUDDY LIST® has been treated in a suggestive manner, the only reasonable conclusion which could be drawn from the evidence points to generic usage. Of particular importance to the Court is the fact virtually every third party which has used the phrase, including so many of AOL's competitors, use it as a generic phrase.

First, in response to AOL's contention that the definition of BUDDY LIST® means something other than multiple user access to computer networks and bulletin boards for the transfer and dissemination of a wide range of information, the Court

notes that the proper inquiry focuses on "whether the way the [terms are] used in the particular context is unique enough to warrant trademark protection." *Wynn Oil Co.*, 839 F.2d at 1190 n. 4. In the Internet context, BUDDY LIST® means a list of individuals whose online status the user wishes to monitor. This has been conclusively proven by the evidence presented to the Court. Given that "[s]ignificant use of a term by competitors in the industry has been recognized, along with dictionary evidence, as indicating genericness," *see Mil–Mar Shoe Co. v. Shonac Corp.*, 75 F.3d 1153, 1159 (7th Cir.1996), the only reasonable conclusion which can be drawn is that BUDDY LIST® is generic.

Regarding the fact that many of the articles cited by AT & T regard AOL's use of BUDDY LIST®, this is of no moment to the Court. The Court must focus on whether AOL has proven that the terms are generic under the primary significance test. In assessing media usage of the terms, the question must not focus on whether the third parties associate the product as one being offered by AOL, but rather whether the media considers the terms as used by AOL and others to be generic. An inquiry which strictly focuses on whether the media associates BUDDY LIST® with AOL resembles an inquiry into whether the term has developed secondary meaning. As stated previously, the existence of secondary meaning is not to be considered when determining whether a term or phrase is generic. *See Abercrombie & Fitch*, 537 F.2d at 9; *see also Genesee Brewing Co.*, 124 F.3d at 143 n. 4; *Keebler Co.*, 624 F.2d at 374; *Reese Publishing*, 620 F.2d 7, 12 n. 2; *Surgicenters*, 601 F.2d at 1016. Instead, what the Court sees is that the media overwhelmingly uses BUDDY LIST® as the generic terms for a list of online individuals, regardless of which company's online service they are discussing. The media uses the phrase to denote the genus, not the species.

Regardless of the fact that BUDDY LIST® is registered by the PTO, thus afforded a presumption that the mark is suggestive and valid, *see Pizzeria Uno*, 747 F.2d at 1529, *see also* 15 U.S.C. 1057(b), the Court concludes that AT & T has come forward with compelling evidence that BUDDY LIST® (as used by AOL, competitors of AOL, the media, and reference books) is generic. Further, while AOL has introduced evidence tending to create a factual dispute, because of the overwhelming amount of evidence presented by AT & T, no reasonable juror could conclude that BUDDY LIST® is anything other than generic. The registration must be canceled.

### D. YOU'VE GOT MAIL

■ Regarding the YOU'VE GOT MAIL service mark, at the Status Conference counsel for AOL raised for the first time their contention that the Court's ruling on the other three marks rendered moot their claim, and AT & T's counterclaim, concerning YOU'VE GOT MAIL.

AOL's Complaint and Amended Complaint asserts that AT & T violated their YOU'VE GOT MAIL mark not through direct usage, but rather through usage of the YOU HAVE MAIL mark. Because the two marks are so inextricably intertwined, AOL states that by using YOU HAVE MAIL AT & T infringed their YOU'VE GOT MAIL mark. Because it is undisputed that AT & T does not now use, has never used, and has claimed no future plans to use YOU'VE GOT MAIL, AOL argues that by granting AT & T's Motion for Summary Judgment as to the YOU HAVE MAIL mark, the Court has rendered the claims pertaining to YOU'VE GOT MAIL moot. AT & T counters that the only legally tenable resolution is a ruling on the merits rather than dismissal, especially as both parties have invested considerable time, effort and money on the instant case.

The doctrine of mootness is an aspect of the Constitution's "case or controversy" requirement. *See Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70, 104 S.Ct. 373, 374–75, 78 L.Ed.2d 58 (1983) (*per*

*curiam* ). "[A] federal court has neither the power to render advisory opinions nor to decide questions that cannot affect the rights of litigants in the case before them." *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). When a case involves a live controversy at the outset, the mootness inquiry examines whether changes in the circumstances that prevailed at the beginning of the litigation have forestalled any opportunity for meaningful relief. *See Church of Scientology of California v. United States,* 506 U.S. 9, 12–13, 113 S.Ct. 447, 449–50, 121 L.Ed.2d 313 (1992). The controversy between the parties must exist at all stages of court proceedings, "not merely at the time the complaint is filed." *Id.; see also Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477–79, 110 S.Ct. 1249, 1253–54, 108 L.Ed.2d 400 (1990). However, when there is no question that a court properly acquired jurisdiction at the outset of the litigation "the burden of demonstrating mootness 'is a heavy one.'" *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting *United States v. W.T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953)); *see also Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 66, 108 S.Ct. 376, 386, 98 L.Ed.2d 306 (1987). At the trial level, the burden of establishing an actual and ongoing controversy rests on the party seeking a declaratory judgment. *See Cardinal Chem. Co. v. Morton Int'l, Inc.,* 508 U.S. 83, 95, 113 S.Ct. 1967, 1974, 124 L.Ed.2d 1 (1993).

Similarly, the Declaratory Judgment Act permits, but does not require, the Court to entertain pleas for a declaratory judgment "in a case of actual controversy" between "interested" litigants. 28 U.S.C. § 2201(a). The court must determine whether " 'under all the circumstances ... there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Preiser,* 422 U.S. at 402, 95 S.Ct. at 2334 (quoting *Maryland Cas. Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).

AT & T argues that holding of *Cardinal Chemical* mandates a finding that the YOU'VE GOT MAIL issue remains justiciable. In that case, the Supreme Court invalidated a Federal Circuit practice of vacating as moot a district court's declaratory judgment of patent invalidity in cases in which the Federal Circuit had concluded that the patent in question had not been infringed. The Supreme Court explained that the district court necessarily had jurisdiction over the defendant's action for declaratory relief of invalidity because it was filed as a counterclaim to the plaintiff's allegation of infringement:

"Merely the desire to avoid the threat of a 'scarecrow' patent, in Learned Hand's phrase, may therefore be sufficient to establish jurisdiction under the Declaratory Judgment Act." If in addition to that desire, a party has actually been charged with infringement of the patent, there is necessarily a case or controversy adequate to support jurisdiction of a complaint, or a counterclaim, under the Act.

*Cardinal Chemical,* 508 U.S. at 96, 113 S.Ct. at 1975. It was equally clear to the Court that a rule rejecting the underlying claim of infringement did not render the declaratory judgment claim moot, because "[a] party seeking a declaratory judgment of invalidity presents a claim independent of the [initial] charge of infringement." *Id.*

AT & T goes on to interpret *Cardinal Chemical* as holding that a federal court's ruling on a claim of infringement cannot render the question of invalidity moot under the case-or-controversy requirement of the Constitution, because "the case remains alive" and might be the subject of further appellate proceedings, and nothing would prevent the appellate court from "reach[ing] the declaratory judgment, as long as the parties continued to dispute the issue of validity ..." *Id.,* 508 U.S. at 97, 113 S.Ct. at 1975.

AT & T argues that *Cardinal Chemical* renders AOL's mootness contentions groundless, because AOL has made clear that it regards YOU'VE GOT MAIL as a distinct mark and that it will continue to assert rights in the mark against others, and on direct appeal from this Court. Given that the Supreme Court stressed the strong public policy in favor of ruling on the issue of validity once the plaintiff brings it into issue by alleging infringement (in order to preclude the party claiming infringement from placing additional litigation burdens on its competitors), *see id.,* 508 U.S. at 99, 113 S.Ct. at 1976, because AOL will continue to assert its rights in YOU'VE GOT MAIL in further proceedings and against others, AT & T maintains that *Cardinal Chemical* teaches this Court that a case or controversy still exists in the instant matter.

However, the only issue before the Court in *Cardinal Chemical* was "whether the affirmance by the Court of Appeals for the Federal Circuit of a finding that a patent has not been infringed [was] a sufficient reason [alone] for vacating a declaratory judgment holding the patent invalid." *Id.,* 508 U.S. at 85, 113 S.Ct. at 1969. The Supreme Court made clear, however, that the case there "concern[ed] the jurisdiction of an intermediate appellate court—not the jurisdiction of ... a trial court or [the Supreme] Court." *Id.,* 508 U.S. at 95, 113 S.Ct. at 1974. The appellate courts and district courts, including this one, which have considered the holding of *Cardinal Chemical* have all come to the conclusion that the case does not apply at the trial level. *See Phonometrics, Inc. v. Northern Telecom Inc.,* 133 F.3d 1459, 1468 (Fed. Cir.1998) (*Cardinal Chemical* "has no bearing on the district court's actions" and thus does not preclude dismissal of counterclaim as moot by district court); *see also Super Sack Mfg. Corp. v. Chase Packaging Corp.,* 57 F.3d 1054, 1060 (Fed.Cir. 1995) ("[T]he trial court neither made a finding on infringement nor reached a conclusion on validity. *Cardinal,* addressed to the propriety of appellate jurisdiction over final judgments respecting infringe-

ment and validity, simply does not apply"); *City of Virginia Beach, Va. v. Brown,* 858 F.Supp. 585, 589 n. 10 (E.D.Va.1994) (reliance in district court on *Cardinal Chemical* misplaced where Supreme Court "specifically noted that it was dealing with the jurisdiction of an intermediate appellate court, not a trial court"); *Giese v. Pierce Chem. Co.,* 43 F.Supp.2d 98, 112 n. 14 (D.Mass.1999) ( [*Cardinal Chemical* ] "concern[s] the jurisdiction of an intermediate appellate court, not a trial court"); *Ball Corp. v. American Nat'l Can Co.,* 846 F.Supp. 729, 730 (S.D.Ind.1993) ("*Cardinal* deals with a policy of the Federal Circuit and leaves undisturbed the ... issue of declaratory judgment jurisdiction in a trifurcated trial after a finding of non-infringement)". In short, while *Cardinal Chemical* is instructive on the narrow question of an appellate court's ability to vacate a judgment of a district court—a question not presented here—it has no bearing on a district court's decision to dismiss a counterclaim for lack of case or controversy.

Instead, to establish that a case or controversy exists sufficient to support a trademark declaratory judgment action with regard to YOU'VE GOT MAIL, AT & T must satisfy a two-pronged test. First, AT & T must have a "real and reasonable apprehension of litigation" as a result of its conduct. *Windsurfing Int'l Inc. v. AMF Inc.,* 828 F.2d 755, 757 (Fed.Cir.1987). Second, AT & T must have "engaged in a course of conduct which brought it into adversarial conflict with the declaratory defendant." *Id.* at 757–58. AT & T fails both prongs of this test.

Since AT & T is not using YOU'VE GOT MAIL, and since its use of YOU HAVE MAIL will be legally protected by this Court's ruling that YOU HAVE MAIL is generic, AT & T can have no apprehension of litigation about YOU'VE GOT MAIL, much less a "real and reasonable" apprehension. *See id.* at 758 (no case or controversy where record showed that declaratory plaintiff was not using contested mark);

*see also Baltimore Luggage Co. v. Samsonite Corp.*, 727 F.Supp. 202, 210 (D.Md. 1989) (no case or controversy where declaratory judgment plaintiff was not engaging in contested conduct; fear of future litigation if conduct took place is insufficient). AT & T's lack of use of YOU'VE GOT MAIL alone defeats AT & T's contentions in this regard.

AT & T's principal argument that a real and reasonable apprehension of future litigation exists is based on speculation that AOL might contend that even if YOU HAVE MAIL is a generic term, AT & T's use of YOU HAVE MAIL violates AOL's rights in YOU'VE GOT MAIL. However, a generic phrase is in the public domain—it can neither constitute a mark nor infringe any mark. *See Kellogg* 305 U.S. at 119, 59 S.Ct. at 114 (generic phrases may be freely used by the public). Furthermore, AOL has eliminated any doubt about the matter through the stipulation that, should this Court's finding that the phrase YOU HAVE MAIL is generic be affirmed on appeal, AOL will not assert that AT & T's present use of that phrase constitutes infringement of AOL's YOU'VE GOT MAIL mark or otherwise gives rise to liability by AT & T to AOL. Such a stipulation has the effect of mooting a declaratory judgment action filed by an accused infringer. *See Super Sack*, 57 F.3d at 1059–60.

AT & T further contends, however, that AOL's appeal from the Court's finding that YOU HAVE MAIL is generic would somehow reinvigorate the dispute concerning YOU'VE GOT MAIL, making AT & T's declaratory judgment action a "real and immediate" controversy before this Court. However, an appeal by AOL of this Court's decision can only challenge the rulings that are made against AOL—in this case, the rulings that YOU HAVE MAIL, IM, and BUDDY LIST® are generic as a matter of law. As noted, if the Court's finding that YOU HAVE MAIL is generic is upheld on appeal, then AT & T's present use of the phrase YOU HAVE MAIL will be immunized from a claim that it infringes AOL's mark YOU'VE GOT MAIL. Only if the Court's ruling on gener-

icness is reversed and the case remanded for trial would the validity and infringement of the mark YOU'VE GOT MAIL once again become a "live" issue—the act of appealing the Court's ruling that YOU HAVE MAIL is generic cannot make it so. Claims by AT & T that a threat of litigation against other makes the case "real and immediate" does not give them the stake required to avoid mootness. *See City of Virginia Beach*, 858 F.Supp. at 589.

AT & T's arguments concerning "adversarial conflict" are not persuasive. Given this Court's ruling, there is simply no adversarial conflict about whether YOU'VE GOT MAIL is a trademark or is instead generic. The absence of such adversarial conflict by itself dooms AT & T's efforts to assert jurisdiction here.

An appropriate Order shall issue.

### ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is hereby

ORDERED that

(1) Defendant's Motion for Summary Judgment is GRANTED, as the Court finds YOU HAVE MAIL, IM, and BUDDY LIST are generic. Plaintiff's Federal trademark registration 2,167,048 for BUDDY LIST is CANCELED;

(2) Defendant's Motion for Summary Judgment is DENIED insofar as it applies to YOU'VE GOT MAIL, as this issue is now MOOT; and

(3) the claims and counterclaims pertaining to the mailbox logo are WITHDRAWN. A copy of this Order shall be sent to the Commissioner of Patents and Trademarks in order to effect the cancellation of the BUDDY LIST mark, and this case is DISMISSED.