James Hollis GLOVER, a/k/a Trading Post, Plaintiff–Appellee,

v.

AMPAK, INCORPORATED; Knives & Things, Incorporated; Mohammad A. Aslam, Individually, Defendants–Appellants,

and

Burt Clark, a/k/a Paula's Pride, Individually, Defendant.

No. 94–2517.

United States Court of Appeals, Fourth Circuit.

Argued July 12, 1995.

Decided Jan. 29, 1996.

**ARGUED:** Alan Hilliard Legum, Alan Hilliard Legum, P.A., Annapolis, Maryland, for Appellants. Michael Abbott Grow, Vorys, Sater, Seymour & Pease, Washington, D.C., for Appellee.

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

## OPINION

NIEMEYER, Circuit Judge:

James H. Glover, a manufacturer and distributor of custom knives, brought a trademark infringement suit against Mohammad A. Aslam and his companies for unauthorized use of Glover's trademark, "White Tail Cutlery," and related marks adopted in connection with the sale of pocket knives. Aslam did not deny using "White Tail" and related deer emblems, but rather he filed a counterclaim, alleging that Glover's trademarks had become generic and therefore his registrations should be canceled. After a bench trial, the magistrate judge found that Glover's trademarks had not become generic and enforced his marks. We affirm.

### I

Glover designs, manufactures, and imports custom made pocket knives. Since at least 1974, he has used the mark "White Tail Cutlery" in connection with his business.

In 1987, Glover entered into a business relationship with Aslam, a seller of surgical instruments and pocket knives imported from Pakistan. Aslam offered to obtain knives from Pakistan with Glover's choice of trademark or design on them. Glover initially requested knives with the words "White Tail" on the blade and the letters "W.T." on the handle. Later, Glover developed a stag's head design and had Aslam supply him with knives displaying the stag's head accompanied by the words "White Tail Cutlery Hand Made." Glover did not authorize Aslam to sell knives with Glover's marks on them to anyone else. Although Glover was not always satisfied with the quality of Aslam's knives, he continued their business relationship for a number of years. In 1989, however, Glover ceased buying from Aslam and began purchasing better quality knives from a different source. Those knives, like Aslam's, displayed Glover's various trademarks.

In 1991, Glover filed applications with the U.S. Patent and Trademark Office to register: (1) the words "White Tail Cutlery," accompanied by the words "Hand Made" and the stag's head design; (2) the words "Hand Made White Tail Cutlery," accompanied by the stag's head design; and (3) the stag's head design by itself. The Patent and Trademark Office issued certificates of registration for those marks for use in the sale of "cutlery: namely, pocket knives."

After Glover ceased buying from Aslam, Aslam began selling knives carrying Glover's stag's head design and the words "Hand Made Especially for White Tail Cutlery." In April 1992, after Glover received certificates of registration for his trademarks from the Patent and Trademark Office, he sued Aslam and his companies for trademark infringement. The district court issued a temporary restraining order prohibiting the defendants from using Glover's marks. Six months later, the United States Customs Service seized a shipment of 48 cases of knives Aslam was importing into this country. The knives bore the words "White Tail Hand Made."

In response to Glover's suit, Aslam filed a counterclaim under 15 U.S.C. § 1119, contending that Glover's registration should be canceled because the term "White Tail" and

the stag's head design had become generic through widespread use in the knife industry.

The parties consented to a bench trial before a magistrate judge who found Glover's marks valid and enforceable. In ruling on Aslam's counterclaim, the judge noted that consumers identified "White Tail" and the stag's head design "with a particular product rather than pocket knives generally," and therefore concluded that Aslam had failed to demonstrate that "White Tail" had become a generic term for knives. This appeal followed.

## II

The sole issue on appeal is whether the magistrate judge was clearly erroneous in finding that Glover's marks were enforceable because they had not become generic. *See Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 639 (Fed.Cir.1991); *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1526 (4th Cir.1984).

When a trademark ceases to identify in the public's mind the particular source of a product or service but rather identifies a class of product or service, regardless of source, that mark has become generic and is lost as an enforceable trademark. *See* 15 U.S.C. § 1064(3). To become generic, the *primary* significance of the mark must be its indication of the nature or class of the product or service, rather than an indication of source. *See Helene Curtis Industries v. Church & Dwight Co.*, 560 F.2d 1325, 1332 (7th Cir.1977), *cert. denied*, 434 U.S. 1070, 98 S.Ct. 1252, 55 L.Ed.2d 772 (1978); *King–Seeley Thermos Co. v. Aladdin Indus., Inc.*, 321 F.2d 577, 580 (2d Cir.1963). The relevant class of goods and services may be that identified in the mark's certificate of registration. *See Magic Wand*, 940 F.2d at 640. Moreover, proof that a mark has become an indicator of a class of product or service and not its source requires more than the subjective view of a casual purchaser; there must be evidence that this is the mark's primary significance to members of the "relevant public." *See* 15 U.S.C. § 1064(3); *Magic Wand*, 940 F.2d at 641.

Because a trademark's certificate of registration carries with it the presumption that the mark is valid, *see* 15 U.S.C. § 1057(b), a party seeking cancellation of a registration on the ground that the mark has become generic must carry the burden of proving that fact by a preponderance of the evidence. *See Pizzeria Uno*, 747 F.2d at 1529 n. 4. Such evidence may come from purchaser testimony, consumer surveys, listings and dictionaries, trade journals, newspapers, and other publications. *See Magic Wand*, 940 F.2d at 641. Only by showing that the public understands by the mark the class of goods or services of which the trademarked product or service is a part can the party who seeks to cancel a registration carry its burden.

In sum, a party who seeks to establish that a mark has become generic must (1) identify the class of product or service to which use of the mark is relevant; (2) identify the relevant purchasing public of the class of product or service; and (3) prove that the primary significance of the mark to the relevant public is to identify the class of product or service to which the mark relates.

Application of the foregoing principles to the circumstances of this case is straightforward. Glover's "White Tail" marks were registered under the cutlery class in connection with the sale of pocket knives. Thus, looking to the actual or potential purchasers of pocket knives as the relevant public, *see Magic Wand*, 940 F.2d at 641, we inquire whether those purchasers understand the term "White Tail" to mean some class or subclass of pocket knife. To put the matter differently, if Aslam had carried his burden, we would find evidence in the record which establishes that when purchasers walk into retail stores and ask for white tails, they regularly mean any brand of pocket or hunting knife, and not specifically Glover's products. *See King–Seeley*, 321 F.2d at 580 (concluding that terms "thermos bottle" and "vacuum bottle" had become virtually synonymous and, therefore, that King–Seeley Thermos Co. had lost its mark "Thermos" to genericity). In this case, however, there is virtually no such evidence, and the magistrate judge was not clearly erroneous in concluding that the public does not understand

"White Tail" and the related marks as indicators of a broader class of knife or cutlery.

Aslam argues that "a prospective purchaser, seeing the words 'white tail' and the deer head design on a knife, will come to the conclusion that the knife is to be used in hunting deer" and that therefore Glover's marks are generic. Aslam relies on the expert testimony of Bernard Levine, as well as the expert testimony of several employees of knife distributors. Upon examining records of approximately 1,500 knife manufacturers, Levine, an expert in knife identification, found "more than a dozen" references to "white tail." Levine testified that he had found many knives decorated with a drawing of a deer's head and some instances of knives bearing the words "white tail" or "white tail deer" either as a decoration or as a designator of a knife model. Levine acknowledged, however, that he did not perform any consumer surveys and was not able to testify to the public's understanding of Glover's trademarks.

Jeffrey L. Daniel, an employee of Frost Cutlery Company, testified that his company sells a model of knife that it calls a "White Tail." Daniel stated that "the name 'deer' is used a lot [on hunting knives] because it is associated with a lot of skinning knives, hunting knives, and general hunting itself." He testified further that customers often order a particular Frost Cutlery knife by referring to its name, "White Tail," rather than to its stock number.

Finally, David Hall, an employee of United Cutlery, testified that his company sells a knife called a "White Tail." Hall stated that the term "white tail" and the picture of a white tail deer were aspects of a "theme for a knife ... that's very common and is part of the knife market." When asked whether United Cutlery ever considered applying for trademark protection for "White Tail," Hall explained that because the term had been used so much, "[he] didn't feel like it was proprietary." Hall also stated that his company used the term "white tail" primarily to indicate to the buyer that United Cutlery's knife would be suitable for use as a hunting knife or a tool to clean white tail deer.

At best, the evidence presented at trial demonstrates that "White Tail" has not been used exclusively by Glover and that the association between hunting knives and deer is easily and commonly made. There is no testimony, however, that "White Tail" was a term used generically for pocket knives. From the evidence Aslam offered, it was not clear error to conclude that when buyers walk into retail stores and ask for white tails, they do not mean any brand of pocket or hunting knife. *See King–Seeley,* 321 F.2d at 580. Aslam's evidence of others' use of the term "White Tail" might be probative of trademark dilution or, if the usage was known by Glover, abandonment. But Aslam has failed to present any evidence that "White Tail" or any of Glover's other marks has become synonymous with "pocket knife" or "hunting knife" to purchasers in the relevant public.

Accordingly, the judgment of the district court is

*AFFIRMED.*