**RETAIL SERVICES INC.; Freebie, Incorporated, Plaintiffs–Appellees,**

v.

**FREEBIES PUBLISHING; Eugene F. Zannon; Gail Zannon, Defendants–Appellants.**

Retail Services Inc.; Freebie, Incorporated, Plaintiffs–Appellants,

v.

Freebies Publishing; Eugene F. Zannon; Gail Zannon, Defendants–Appellees.

Nos. 03–1272, 03–1317.

United States Court of Appeals, Fourth Circuit.

Argued: Oct. 29, 2003.

Decided: April 13, 2004.

536

**ARGUED:** Terence Patrick Ross, Gibson, Dunn & Crutcher, L.L.P., Washington, D.C., for Appellants/Cross-appellees Freebies Publishing, et al. Alan Charles Raul, Sidley, Austin, Brown & Wood, L.L.P., Washington, D.C., for Appellees/Cross-appellants Retail Services, Inc., et al. **ON BRIEF:** Hill B. Wellford, III, Gibson, Dunn & Crutcher, L.L.P., Washington, D.C., for Appellants/Cross-appellees Freebies Publishing, et al. Joseph V. Jest, Sidley, Austin, Brown & Wood, L.L.P., Washington, D.C., for Appellees/Cross-appellants Retail Services, Inc., et al.

Before WILKINS, Chief Judge, and TRAXLER and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Traxler wrote the opinion, in which Chief Judge Wilkins and Judge Duncan joined.

TRAXLER, Circuit Judge:

Retail Services, Inc. and Freebie, Inc. (collectively "RSI") brought this action for declaratory relief against Freebies Publishing, Eugene F. Zannon, and Gail Zannon (collectively "defendants") seeking an order declaring that RSI's use of the domain name <freebie.com> did not violate the Anticybersquatting Consumer Protection Act, *see* 15 U.S.C.A. § 1125(d)(1) (West Supp.2003), that RSI's use of the term "freebie" in its domain name did not infringe upon defendants' registered FREEBIES trademark under the Lanham Act, *see* 15 U.S.C.A. § 1114 (West 1997 & Supp.2003), and that the term "freebies" is generic and therefore not protectable as a trademark. In response, defendants filed a counterclaim under the Lanham Act based on RSI's use of the word "freebie" in its domain name, asserting claims for trademark infringement and cybersquatting. Additionally, defendants included Lanham Act claims for unfair competition and trademark dilution. *See* 15 U.S.C.A. § 1125(a), (c) (West 1998 & Supp.2003). Defendants also alleged that RSI's <freebie.com> domain name violated section 18.2–500 of the Virginia Code.

The district court concluded that the word "freebies" is generic and not registrable as a federal trademark. Without a valid trademark before it, the court then awarded summary judgment to RSI on all claims and counterclaims. The district court also addressed *sua sponte* RSI's claim for attorneys' fees and costs that RSI raised in its complaint but did not pursue as part of its summary judgment motion. Finding that defendants harbored no fraudulent intent or bad faith in asserting the counterclaims and that no "exceptional" circumstances otherwise existed, the district court denied RSI's claim for attorneys' fees. 15 U.S.C.A. § 1117(a) (West Supp.2003).

Defendants appeal the district court's grant of summary judgment on a number of grounds, focusing mainly on the argument that there was a genuine factual dispute over the generic nature of the term "freebies"—a factual dispute created, if nothing else, by the certificate of registration issued to defendants by the Patent and Trademark Office ("PTO") for the FREEBIES trademark.

RSI cross appeals the *sua sponte* denial of attorneys' fees and costs.

For the reasons set forth below, we affirm the decision of the district court *in toto*.

## I.

Before we recount the facts of this case, a brief discussion of the legal context in which the facts arise is helpful. Trademarks "identify and distinguish" goods produced by one person "from those manufactured or sold by others and ... indicate the source of the goods." 15 U.S.C.A. § 1127 (West Supp.2003). To the purchasing public, a trademark "signif[ies] that all goods bearing the trademark" originated from the same source and "that all goods bearing the trademark are of an equal level of quality." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 3.2 (4th ed.2003) [hereinafter McCarthy]. Because of its role in assuring consumers of the origin and quality of the associated goods, a trademark is also "a prime instrument in advertising and selling the goods." *Id.*

■ Thus, a proposed mark cannot acquire trademark protection unless the mark is distinctive, that is, unless it serves the traditional trademark functions of "distinguishing the applicant's goods from those of others" and identifying the source of the goods. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *see* 15 U.S.C.A. § 1052 (West 1997). The antith-

esis of a distinctive mark is a "generic" mark which merely employs "the common name of a product or service," *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 464 (4th Cir.1996), or "refers to the genus of which the particular product is a species," *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). Because a generic mark, by definition, neither signifies the source of goods nor distinguishes the particular product from other products on the market, a generic term cannot be protected as a trademark nor registered as one. *See Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753; *Sara Lee*, 81 F.3d at 464; *Larsen v. Terk Techs. Corp.*, 151 F.3d 140, 148 (4th Cir.1998) (noting that " 'generic marks' are accorded no protection at all...."). "The concepts of 'generic name' and 'trademark' are mutually exclusive" because a generic term "can never function as a mark to identify and distinguish the products of only one seller." 2 McCarthy at § 12:1. From a policy standpoint, of course, if a business were permitted to appropriate a generic word as its trademark, it would be "difficult for competitors to market their own brands of the same product. Imagine being forbidden to describe a Chevrolet as a 'car' or an 'automobile' because Ford or Chrysler or Volvo had trademarked these generic words." *Blau Plumbing, Inc. v. S.O.S. Fix–It, Inc.*, 781 F.2d 604, 609 (7th Cir.1986).

■ Whether trademark protection extends to a proposed mark is tied to the mark's distinctiveness. *See Sara Lee*, 81 F.3d at 464. In determining the distinctiveness of a given mark, courts use a categorical approach, placing the mark in one of four classifications that increase in distinctiveness as follows: generic, descriptive, suggestive, and arbitrary or fanciful. *See Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir.1984). On the

opposite end of the spectrum from the generic category are marks that are fanciful or arbitrary—inherently distinctive marks. Fanciful marks are, for the most part, nonsense "words expressly coined for serving as a trademark." *Sara Lee,* 81 F.3d at 464 (offering "Clorox®, Kodak®, Polaroid®, and Exxon®" as examples). Arbitrary marks consist of recognizable words used in connection with products for which "they do not suggest or describe any quality, ingredient, or characteristic," as if the trademark was "arbitrarily assigned." *Id.* (citing "Camel® cigarettes" and "Apple® computers" as examples).

■ Between the generic and the arbitrary or fanciful categories are descriptive marks and suggestive marks, which are often difficult to distinguish from each other. Descriptive marks "merely describe a function, use, characteristic, size, or intended purpose of the product." *Id.* (mentioning "After Tan post-tanning lotion" and "5 Minute Glue"). Descriptive marks are not inherently distinctive; the Lanham Act "accord[s] protection only if they have acquired a 'secondary meaning.'" *Larsen,* 151 F.3d at 148; *see* 15 U.S.C.A. § 1052(e)(1) (registration may be refused if the proposed mark, "when used on or in connection with the goods of the applicant[,] is merely descriptive or deceptively misdescriptive of them"). Saying that a trademark has acquired "secondary meaning" is shorthand for saying that a descriptive mark *has become* sufficiently distinctive to establish "a *mental association* in buyers' minds between the alleged mark and a single source of the product." 2 McCarthy at § 15:5; *see Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753 ("This acquired distinctiveness" necessary for a descriptive mark to be protected "is generally called 'secondary meaning.'"); *Sara Lee,* 81 F.3d at 464 (explaining that "secondary meaning" exists when, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself" (internal quotation marks omitted)).

■ In contrast to descriptive marks, suggestive marks are inherently distinctive and, like arbitrary or fanciful marks, qualify for registration without any showing of "secondary meaning." *See Pizzeria Uno,* 747 F.2d at 1529. A mark is suggestive if it "connote[s], without describing, some quality, ingredient, or characteristic of the product." *Sara Lee,* 81 F.3d at 464 (providing the following examples: "Coppertone®, Orange Crush®, and Playboy®"). A helpful rule of thumb is that "'if the mark imparts information directly, it is descriptive,'" but "'[i]f it stands for an idea which requires some operation of the imagination to connect it with the goods, it is suggestive.'" *Pizzeria Uno,* 747 F.2d at 1528 (quoting *Union Carbide Corp. v. Ever–Ready, Inc.,* 531 F.2d 366, 379 (7th Cir.1976)).

With these concepts in mind, we consider the facts.

## II.

In 1979, the Zannons purchased the right to publish *Freebies Magazine,* a periodical providing information about free mail-order offerings. The Zannons also acquired ownership rights to the stylized trademark FREEBIES, which the previous publisher registered in 1978 to use as a logo for the magazine. Apparently, the Zannons abandoned this particular mark for a period of time beginning in June 1985; however, in March 1992, the Zannons filed an application, on behalf of Freebies Publishing, with the PTO for a new certificate of registration for a different rendition of the stylized FREEBIES mark. Although the PTO eventually issued a certificate of registration for the mark, the application process was not without difficulty. The PTO's examining

attorney initially refused the application because, among other reasons, "the proposed mark merely describes the goods ... [t]he mark describes the subject matter of applicant's publication." J.A. 145. Freebies Publishing submitted a response but was unable to convince the PTO that the proposed FREEBIES trademark was suggestive rather than merely descriptive.

In December 1992, having received no evidence demonstrating that defendants' mark had "acquired secondary meaning," J.A. 140, the PTO finalized its refusal of registration. This refusal was withdrawn, however, after Eugene Zannon filed an affidavit under 37 C.F.R. § 2.41(b), which allows the PTO to accept as evidence of distinctiveness a declaration that the proposed mark has been in "substantially exclusive and continuous use in commerce ... by [the] applicant for ... five years." Thus, the FREEBIES mark was finally registered on November 30, 1993, for use in connection with "periodicals; namely, magazines and newspapers with information about mail order offerings." J.A. 96.

Defendants continued publishing *Freebies Magazine* until March 2001. After that time, Freebies Publishing shifted its focus from traditional printed media to cyberspace, offering its mail order information over the Internet under the domain name <freebies.com>. Defendants apparently anticipated this change well prior to 2001, having registered the domain name in November 1997.

RSI provides "customer management services" to retailers, which RSI delivers to its clients through computer products designed to instantly profile any given customer making a retail purchase. When a customer makes a purchase from an RSI client, the RSI product enables information to be sent from the point of sale to RSI's database of customer transactions. The system then instantaneously identifies a potential "incentive offer," described by RSI as "a freebie," which is printed out and presented to the customer along with the purchase receipt. J.A. 633.

In 1991, between the time that the defendants abandoned the original FREEBIES trademark and applied for the new registration, RSI received legal advice that the term "freebie" was available for use and could be legally protected. RSI took no further action, however, until 1995, when it registered the domain name <freebie.com> for later use, two years before defendants registered the <freebies.com> domain name. By that time, of course, FREEBIES was a registered trademark.

In 1998, RSI agreed to perform customer management services for Blockbuster, Inc., a large and well-established corporation in the retail business of video and DVD rentals and sales. In order to service the Blockbuster account, Frank Byerley, RSI's owner, formed Freebie, Inc., drawing the corporate name from a promotional scheme for Blockbuster customers to earn "Freebie Points" which they could cash in for rent-free viewing. In August 2001, RSI began operating its website at <www.freebie.com> so that Blockbuster customers could manage their Freebie Points online. Meanwhile, defendants had been offering their mail-order information online at <www.freebies.com> for five months.

In December 2001, defendants demanded that RSI cease using the word "freebie" in connection with its business. RSI refused to do so, believing the word "freebies" to be generic in nature, not entitled to trademark protection, and free for public use. Defendants initiated an arbitration proceeding against RSI pursuant to the Uniform Domain Name Dispute Resolution Policy ("UDRP"), which is incorporated into all domain-name registration agreements pursuant to which a second-

level domain name is issued to a member of the public. The UDRP requires the registrant to submit disputes concerning the domain name to an approved dispute resolution provider—in this case the National Arbitration Forum—for the purpose of what is essentially non-binding arbitration. *See Dluhos v. Strasberg*, 321 F.3d 365, 372–73 (3d Cir.2003) ("UDRP proceedings do not fall under the Federal Arbitration Act ... [and] judicial review of those decisions is not restricted to a motion to vacate arbitration award under § 10 of the FAA, which applies only to binding proceedings likely to 'realistically settle the dispute.'"). The arbitrator concluded that <freebie.com> was confusingly similar to defendants' registered trademark and that RSI had no trademark rights in the name freebie. Additionally, the arbitrator determined that RSI registered the domain name in bad faith because it used the plural term "freebies" as a metatag for its website, which directed an Internet search for "freebies" to RSI's site.[1] The arbitrator was persuaded that this evidence demonstrated RSI's awareness of defendants' FREEBIES trademark and, therefore, bad faith in acquiring its domain name. Accordingly, RSI was ordered to transfer the domain name <freebie.com> to defendants.

RSI responded by filing this action against defendants for a declaration that RSI's use of the word "freebie" as part of its domain name does not violate the Anti-cybersquatting Consumer Protection Act,

*see* 15 U.S.C.A. § 1125(d), and does not constitute trademark infringement, *see* 15 U.S.C.A. § 1114(1)(a), trademark dilution, *see* 15 U.S.C.A. § 1125(c), or unfair competition, *see* 15 U.S.C.A. § 1125(a). RSI also asked the district court to rule that the word "freebies" is generic and to cancel the FREEBIES registration, rendering the arbitration order null and void. Defendants counterclaimed for trademark infringement and dilution, cybersquatting, and violations of Virginia law.

The district court granted summary judgment to RSI, concluding that the evidence overwhelmingly demonstrated the generic nature of the word "freebies." *See Retail Servs., Inc. v. Freebies Publishing*, 247 F.Supp.2d 822, 825–27 (E.D.Va.2003). The court rejected the same argument defendants now offer on appeal—that summary judgment was inappropriate because an issue of fact existed by virtue of the PTO's registration of the FREEBIES mark, which is *prima facie* evidence that the mark was sufficiently distinctive to warrant trademark protection. Defendants also argued unsuccessfully that, even though use of the word "freebie" is now widespread, the FREEBIES mark was entitled to protection because the defendants did not *use* the word in the generic sense. On appeal, defendants contend that the district court was wrong to reject these arguments.

We apply the familiar *de novo* standard in reviewing a district court's grant of summary judgment based on the conclu-

1. An Internet web page is essentially a "computer data file[ ] written in Hypertext Markup Language (HTML)—which contain[s] information such as text, pictures, sounds, audio and video recordings, and links to other web pages." *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1044 (9th Cir.1999) (internal quotation marks omitted). If an Internet user does not know the domain name for a given website—or if the user simply wants information on a certain topic but does not know whether any websites on that topic exist—he can perform a keyword search using a "search engine" such as Yahoo or Google to locate web pages that might suit his needs. "Search engines look for keywords in places such as domain names, actual text on the web page, and metatags. Metatags are HTML code intended to describe the contents of the web site." *Id.* at 1045. A metatag's HTML code is not visible to Internet users. *See id.* at 1061–62 n. 23.

sion that a mark is insufficiently distinctive to warrant trademark protection. *See U.S. Search, LLC v. U.S. Search.com, Inc.*, 300 F.3d 517, 522 (4th Cir.2002). Summary judgment is to be entered when, viewed in the light most favorable to the non-movant, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see U.S. Search*, 300 F.3d at 522. In light of the district court's holding, the relevant inquiry here is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A mere "scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505; *see Nartron Corp. v. STMicroelectronics, Inc.*, 305 F.3d 397, 405 (6th Cir.2002), *cert. denied*, 538 U.S. 907, 123 S.Ct. 1486, 155 L.Ed.2d 227 (2003) (affirming summary judgment on the basis of "overwhelming evidence" of genericness).

## III.

■ We turn first to defendants' argument that their certificate of registration alone creates an issue of fact as to whether the word "freebies" is generic and thereby precludes summary judgment in favor of RSI. For the reasons that follow, we cannot agree.

Under the Lanham Act, the issuance of a certificate of registration arms the registrant with "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark." 15 U.S.C.A. § 1057(b) (West 1997). Because the PTO may not register a generic mark, the fact that a mark is registered is strong evidence that the mark satisfies the statutory requirements for the distinctiveness necessary for trademark protection. *See* 15 U.S.C.A. §§ 1052(e), 1057(b); 15 U.S.C.A. § 1064(3) (West 1997). The certificate of registration supplies "the registrant [with] . . . prima facie evidence that its mark is not generic in the eyes of the relevant public . . . and that its mark . . . at a minimum is descriptive *and* has obtained secondary meaning." *America Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 816 (4th Cir.2001); *see U.S. Search*, 300 F.3d at 524. This is a significant procedural advantage for the registrant. Without a certificate of registration, the owner would be required to establish that the disputed mark was sufficiently distinctive to warrant trademark protection in the first place. *See Pizzeria Uno*, 747 F.2d at 1529. The effect of the presumption is to satisfy that burden in the absence of rebutting evidence. *See America Online*, 243 F.3d at 818; *see also Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir.2002) ("In trademark terms, the registration is not absolute but subject to rebuttal" and "discharges the plaintiff's original common law burden of proving validity in an infringement action.").

The presumption of validity flowing from trademark registration, therefore, has a burden-shifting effect, requiring the party challenging a registered mark to produce sufficient evidence to establish that the mark is generic by a preponderance of evidence. *See Glover v. Ampak, Inc.*, 74 F.3d 57, 59 (4th Cir.1996); *Pizzeria Uno*, 747 F.2d at 1529. The burden shifted by the presumption is one of production rather than persuasion. *See* Fed. R.Evid. 301 ("In all civil actions and proceedings not otherwise provided for by Act

of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast."). If sufficient evidence of genericness is produced to rebut the presumption, the presumption is "neutralize[d]" and essentially drops from the case, although the *evidence* giving rise to the presumption remains. *America Online,* 243 F.3d at 818; *cf. Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ("[A]lthough the presumption of discrimination 'drops out of the picture' once the defendant meets its burden of production ... the trier of fact may still consider the evidence establishing the plaintiff's prima facie case....").

Relying on our decision in *America Online,* defendants contend that summary judgment in an infringement action on the basis that a registered trademark is or has become generic is *never* appropriate. Defendants argue that *America Online* established a rule in this circuit that the issuance of a certificate of registration is, by itself, sufficient to create a jury issue on the validity of the mark in question because it embodies the PTO's informed opinion that the mark is registrable. We disagree.

In *America Online,* we considered the question of whether, in a federal trademark infringement action, a district court should afford *Chevron*-type deference to the PTO's determination that a given mark is registrable (and, by definition, not generic). In rejecting the application of *Chevron* deference, we explained that the PTO's "decision to register a mark, without requiring evidence of secondary meaning, [is] powerful *evidence* that the registered mark is suggestive" and that a district court should "receiv[e] the certificate of registration ... into evidence and treat [it] as prima facie evidence of the validity of the mark." 243 F.3d at 817–18. Although we concluded that "the prima facie evidence provided by the certificate of registration was in this case sufficient to establish a question of material fact that could not be resolved on summary judgment," *id.* at 818, we nowhere suggested that registration created a *per se* issue of fact sufficient to defeat summary judgment. The panel in *America Online* carefully noted that the registration was sufficient *"in this case"* to preclude summary judgment, and that, in addition to the certificate of registration, there was *"other* evidence" that the mark was not generic. *Id.* at 818 (first emphasis added).[2] The latter observation, of course, would be pointless if, as defendants argue, *America Online* held that a certificate of registration alone settles the matter of summary judgment. At most, *America Online* suggests that, *as a general rule,* the introduction of a certificate of registration will create enough of an factual dispute to render summary judgment inappropriate on the basis that the mark is generic. *See U.S. Search,* 300 F.3d at 524 ("The prima facie evidence provided by the certificate of registration is generally sufficient to establish a question of material fact that

---

**2.** *America Online* was recently offered to the Ninth Circuit in support of the argument that registration precludes summary judgment on the issue of trademark validity. *See Tie Tech, Inc. v. Kinedyne Corp.,* 296 F.3d 778, 784 (9th Cir.2002). Although the Ninth Circuit hinted that it might accord less weight to the certificate of registration than would this court, it rightly observed *America Online* did not support appellant's argument that "the registration itself would always raise a material issue of fact." *Id.*

cannot be resolved on summary judgment."). Accordingly, we reject the defendants' contention.

## IV.

Having decided that the certificate of registration alone does not immunize defendants' claims from dispositive motions prior to trial, we turn to the district court's conclusion that there was no genuine issue of material fact on the issue of genericness and that RSI was thus entitled to summary judgment.

### A. RSI's Evidence of Genericness

■ To rebut the presumption that the mark is not generic, RSI must offer sufficient proof that "the *primary* significance of the mark [is] its indication of the nature or class of the product or service, rather than an indication of source." *Glover,* 74 F.3d at 59. Additionally, the evidence must demonstrate the generic understanding of the mark from the viewpoint of the " 'relevant public.' " *Id.* (quoting 15 U.S.C.A. § 1064(3)). The district court determined that the relevant consuming public "includes Internet users seeking information about mail order offerings." *Retail Servs.,* 247 F.Supp.2d at 826. We agree with this conclusion, and defendants do not take issue with it.

Defendants' mark was registered for use in connection with "magazines and newspapers with information about mail order offerings." J.A. 96. Although the publication of the printed *Freebies Magazine* ceased in 2001, defendants continued to offer the same kinds of information on their website, hoping to attract Internet users looking for mail-order material. Thus, the issue boils down to this: whether RSI has offered sufficient evidence that, in the minds of Internet users interested in online free mail-order information, the term "freebie" or "freebies" does not give "an indication of source," *Glover,* 74 F.3d at 59, but rather identifies the nature or

general class of goods or services, *i.e.,* employs the "common name of a product or service." *Sara Lee,* 81 F.3d at 464.

Evidence offered to rebut the presumption of validity may come from any number of sources, including "purchaser testimony, consumer surveys, listings and dictionaries, trade journals, newspapers, and other publications." *Glover,* 74 F.3d at 59; *see In re Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 828 F.2d 1567, 1570 (Fed.Cir. 1987) ("Evidence of the public's understanding of the term may be obtained from any competent source . . . ."). Other common sources include evidence of "generic use by competitors, generic use of the term by the mark's owners, and use of the term by third parties in trademark registrations." *Nartron,* 305 F.3d at 406.

■ The district court considered various dictionary definitions that were roughly uniform in defining "freebie" as a slang term meaning " 'something . . . given or received without charge.' " *Retail Servs.,* 247 F.Supp.2d at 826 (quoting *Webster's Ninth Collegiate Dictionary* 491 (1988)); *see, e.g.,* The American Heritage College Dictionary 542 (3d ed.1997) ("An article or service given free."); *Webster's II New Riverside University Dictionary* 504 (1988) ("Something given or received gratis . . . ."); *Cambridge International Dictionary of English,* Online Edition, *available at* http://dictionary.cambridge.org ("[S]omething which is given to you without you having to pay for it, esp. as a way of attracting your support for or interest in something."). The district court noted that, according to the *Oxford English Dictionary,* "freebie" has been understood to mean " 'something that is provided free' " since its 1942 inclusion "in *The American Thesaurus of Slang: A Complete Reference Book of Colloquial Speech." Retail Servs.,* 247 F.Supp.2d at 826–27. Although not controlling, "dictionary definitions are

relevant and sometimes persuasive" on the issue of genericness "based upon the assumption that dictionary definitions usually reflect the public's perception of a word's meaning and its contemporary usage." 2 McCarthy at § 12.13 (internal quotation marks omitted); *see Harley–Davidson, Inc. v. Grottanelli,* 164 F.3d 806, 810 (2nd Cir.1999) ("[D]ictionary definitions of a word to denote a category of products are significant evidence of genericness."); *Mil–Mar Shoe Co. v. Shonac Corp.,* 75 F.3d 1153, 1158 (7th Cir.1996) ("Because generic use implies use consistent with common understanding, we have often looked to dictionaries as a source of evidence on genericness.").

Furthermore, as noted above, evidence of the owner's generic use, in particular, "is strong evidence of genericness." 2 McCarthy at § 12.13. The district court highlighted the contents of defendants' own <freebies.com> website, which undercut their position that "freebies" is not a generic term. *See Retail Servs. Inc.,* 247 F.Supp.2d at 827. For example, the <freebies.com> home page included a banner announcing that the website was "BRINGING YOU THE BEST FREE AND ALMOST FREE OFFERS SINCE 1977" and stating that "Freebies.com is the best place on the web for free and almost free offers that you won't find anywhere else." J.A. 1382. The stylized freebies logo at the top of the home page appeared above the same slogan that had been emblazoned on the printed version of *Freebies Magazine:* "The Magazine with Something for Nothing." J.A. 238; 1382.

The actual offers included on <freebies.com> or in *Freebies Magazine* used the term "freebies" in this same sense— items that the reader would ordinarily expect to pay for but could obtain for free with the information provided by the magazine or website. For example, the September–October 1983 edition of *Freebies Magazine* included a section entitled "Football Freebies" which explained how to obtain "fabulous freebies offered by your own special team." J.A. 267. The section was divided into two columns. One column, under the heading TEAM, listed addresses for various National Football League franchises, and the other column, under the heading FREEBIE, listed items that could be obtained for no cost (such as bumper stickers or posters) upon request. Likewise, on the website, typical items might include American flag lapel pins or tie tacks, like those offered on January 9, 2003, which could be obtained by sending the specified postage and handling costs to the address provided by <freebies.comm>. Gail and Eugene Zannon, moreover, both gave deposition testimony confirming that their use of the term "freebies" was consistent with the commonly understood meaning of the word, referring to free goods and services, and that their primary business is "the distribution of [information about] free or almost free goods and services." J.A. 447; 537.

Defendants' use of the term "freebies" is consistent with the use of that term by scores of other websites on the Internet. Typical of these domain names are <weeklyfreebie.com>, which compiles categorized lists of "freebie" products and where to get them, J.A. 1174; <coolfreebielinks.com>, which uses a banner announcing "Freebies, free stuff, giveaways ... call them what you want, they all break down to the same thing ... getting something for nothing," J.A. 1154; <freebies24x7.com>, which "offers one of the Web's largest collection of freebies.... If it's freebies you want, then it's freebies you got .... so put away your wallet and grab some Freebies!" J.A. 1258; and <freebiedirectory.com>, the domain name for a website describing itself as "Your searchable source for FREEBIES" and

providing information about a wide variety of free products and services. J.A. 1152. There is also <freebiedot.com>, "your source for freebies and free stuff . . . daily for freebies hunters like you," J.A. 1139; <freebies4all.net>, which claims to be "[t]he # 1 resource for FREE stuff on the web . . . only top notch freebies are listed," J.A. 1140; and <alwaysfreebies.com>, which also claims to be the Internet's "leading resource for free stuff" with "the latest and greatest freebies," J.A. 1140.

Defendants' website, and those listed above, are but a few of the 1,600–plus websites (or more) that incorporate the word "freebie" or "freebies" into their domain names. These websites are now so common that the term "freebie site" is often used by these sites to refer to other sites that, like defendants, offer information about free products or services.[3] In addition to this voluminous information pulled directly from these websites, the record contains declarations from competitor sites. Glenda McGarity, the owner of a website called "Killer Freebies & Deals," <killerfreebies.com>, understands "the word 'freebies' to refer to free or almost free goods and services," supplies "information about freebies offered by other individuals or companies," and is aware of many such Internet businesses that offer freebies. J.A. 626. Likewise, Lee Seats, who operates About.com's section on the topic of freebies, <freebies.about.com>, uses "freebies" on his website "to refer to free or almost free goods and services" and is "in the business of providing information, tips and advice about how to obtain free or almost free goods and services (i.e., freebies) offered by other companies or individuals." J.A. 629. Finally, RSI offered a list of fifty-one newspaper or news media reports using the phrase "freebie site" to refer to websites similar to defendants' freebies.com.

The district court concluded that the evidence of genericness was so one-sided that no genuine issue of fact existed as to whether, "in the public's mind, 'freebies' indicates free or almost free products and is not identified with defendants or their website in particular." *Retail Servs.*, 247 F.Supp.2d at 827. Such one-sided evidence necessarily rebuts the presumption of non-genericness.

### B. Defendants' Arguments

#### 1. Additional Evidence that "Freebies" Is Not Generic.

Defendants contend that the district court failed to take into consideration any of their evidence, in addition to the certificate of registration, that created an issue of fact by demonstrating the distinctive, non-generic nature of the mark. First, defendants point out that in reviewing defendants' application for trademark registration, the PTO's examining attorney considered one of the same dictionary definitions of "freebie" that the district court found persuasive on the issue of genericness. Defendants argue the fact that the PTO ultimately issued the certificate of registration seriously undercuts the value of the dictionary definition. This is not additional evidence; it is part and parcel of the certificate of registration which, as we explained at length, is itself evidence the word or phrase in question is not generic. We fail to see how this part of the registration process offers anything that the whole does not. The district court, of course, took the registration into account and acknowledged its presumptive effect, but simply concluded it was not enough to prevent summary judgment for

---

**3.** Many "freebie sites" include links to other freebie sites. For example, <freebiesforwomen.com> announces that "[i]f you are a *free-* *bie site* and would like to exchange links— please contact us." J.A. 1002.

RSI. *See Retail Servs.*, 247 F.Supp.2d at 826.[4]

■ Defendants also contend that the district court all but ignored substantial evidence demonstrating that the registered term was not only not generic, but was a strong, commercially successful mark with a well-established secondary meaning. In particular, defendants high-light that <freebies.com> receives an average of "100,000 visits per month from consumers around the world," J.A. 712; that *Freebies Magazine* in print form had millions of paying subscribers; and that defendants sold more than 385,000 books offering information similar to that provided in *Freebies Magazine.* Evidence of an acquired secondary meaning, however, has no relevance unless the mark in question has been found not to be generic. *See, e.g., Home Builders Ass'n of Greater St. Louis v. L & L Exhibition Mgmt., Inc.*, 226 F.3d 944, 949 (8th Cir.2000) ("A 'generic' mark is the common name of a product or service. . . . It may not be registered nor used exclusively by one competitor, even if it has acquired secondary meaning."); *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 222 (3rd Cir. 2000) (same).

■ For these same reasons, we also discount defendants' reliance on the evidence of actual and potential confusion—according to defendants, for example, there were several hundred complaints from consumers who were seeking defendants' website but ended up in RSI's site, or vice-versa. Evidence establishing a likelihood of confusion simply "do[es] not bear upon the question of whether [a] trademark . . . [is] generic." *Ale House Mgmt., Inc. v. Raleigh Ale House, Inc.*,

205 F.3d 137, 144–45 (4th Cir.2000). In sum, defendant has failed to highlight any significant evidence, outside of the certificate of trademark registration, that would create a genuine issue of fact on genericness.

2. Non–Generic Use of "Freebies"

Defendants contend that, even if the word "freebies" is generic, they were not using this term generically *in connection with their business,* which defendants carefully describe as the provision of "information about no-cost or low cost promotional offers." J.A. 412. Defendants emphasize that they do not actually distribute or offer the free products or samples, which they concede would constitute a generic use of "freebies," but simply tell consumers how to obtain such items from others, which they claim does not. In essence, defendants argue that this distinction transforms their use of FREEBIES from generic to descriptive.

In our view, this razor-thin distinction is not significant. Of course, it is certainly possible for a term to serve as a generic description for one category of products but function as a distinctive mark for unrelated products in a different context. *See, e.g., In re Seats, Inc.*, 757 F.2d 274, 277 (Fed.Cir.1985) (holding that the word "SEATS" was not generic for ticket reservations services even though it could not be registered in connection with chairs or couches). Even though defendants do not directly distribute free products or "freebies," their business nonetheless revolves around "freebies" in the generic sense of the word. As defendants' website proclaims, they are "BRINGING YOU THE BEST FREE AND ALMOST FREE OFFERS SINCE 1977!"[5] J.A. 1382. Ac-

---

**4.** We note, contrary to defendants' suggestion that the district court ignored the PTO's consideration of the dictionary definition of "freebie," the transcript of the summary judgment hearing contains an extended discussion of

the PTO's review of the FREEBIES application, specifically including the examining attorney's consideration of this definition.

**5.** The district court supplied a particularly appropriate example of the non-generic use of

cordingly, we reject defendants' contention that they were not using the term *in its generic sense.*

### 3. The Incontestable Status of FREEBIES

Defendants suggest that, even if we do not agree that FREEBIES is, at the very least, a descriptive mark that has acquired secondary meaning, it is beyond dispute that FREEBIES has become incontestable, and therefore is not subject to challenge with regard to its secondary meaning. This argument misses the mark.

■■ If a registered trademark becomes incontestable, the rebuttable presumption that a registered mark has acquired secondary meaning becomes "conclusive evidence of the registrant's exclusive right to use the registered mark" subject to a number of affirmative defenses enumerated in the Lanham Act. 15 U.S.C.A § 1115(b) (West 1998 & Supp.2003). This list, however, does not include a defense based upon a mark's lack of secondary meaning—a merely descriptive mark, then, is subject to challenge based on its lack of distinctiveness until it acquires incontestable status. *See Park 'N Fly,* 469 U.S. at 196, 105 S.Ct. 658. Thus, a presumption arises from the registration of a trademark that the mark is entitled to trademark protection because of either the mark's inherently distinctive nature or its secondary meaning, but the mark is subject to challenge on the basis that it is merely descriptive. *See id.; America Online,* 243 F.3d at 817–18. The validity of the same registered mark, after qualifying for incontestable status, is conclusively presumed and may not be challenged as merely descriptive. *See Park 'N Fly,* 469 U.S. at

196, 105 S.Ct. 658. The Supreme Court provided this concise summary:

> A mark that is merely descriptive of an applicant's goods or services is not registrable unless the mark has secondary meaning. Before a mark achieves incontestable status, registration provides prima facie evidence of the registrant's exclusive right to use the mark in commerce. The Lanham Act expressly provides that before a mark becomes incontestable an opposing party may prove any ... defense which might have been asserted if the mark had not been registered ... [including a] challenge [to the] mark as merely descriptive.... With respect to incontestable marks, ... registration is *conclusive* evidence of the registrant's exclusive right to use the mark.... Mere descriptiveness is not recognized by [the relevant provisions of the Lanham Act] as a basis for challenging an incontestable mark.

*Id.* (internal citations omitted).

Here, however, the issue is not whether the mark is merely descriptive, but whether it is generic. And incontestability is never a shield for a mark that is generic. Although § 1115(b) does not enumerate the generic nature of a trademark as a basis for challenging an incontestable mark, a registration is subject to cancellation at any time "if the registered mark becomes the generic name for the goods or services ... for which it is registered." 15 U.S.C.A. § 1064(3). As we observed before, a generic word can never function as a trademark or receive a certificate of registration as one. Even an incontestable mark, therefore, comes within the reach of § 1064(3) and may be canceled if it becomes generic. *See Park 'N Fly,* 469 U.S. at 195, 105 S.Ct. 658.

"freebies": "[T]o refer to additive-free food products." *Retail Servs.,* 247 F.Supp.2d at 827 n. 5.

#### 4. Stylized Lettering in the FREEBIES Trademark

Finally, defendants contend that, separate and apart from their rights in the word FREEBIES, the stylized rendering of the letters is sufficiently distinctive to merit registration. Assuming the registered *display* of FREEBIES is distinctive (which is far from clear), that fact does not aid defendants—"such a registration does not give any exclusive right to use the generic word per se"—"[t]he only exclusive right from such a 'picture' registration is the use of that exact 'picture' which happens to spell out a generic name." 2 McCarthy at § 12:40 (citing *Time, Inc. v. Petersen Pub. Co.*, 173 F.3d 113 (2nd Cir. 1999)). We have no difficulty concluding that the modest stylized lettering of the FREEBIES mark in no way affords defendants ownership rights in the generic word "freebies." And, defendants do not guide us to anything in the record to suggest that the stylized rendition of the word is "so distinctive as to create a commercial impression separate and apart from the [generic] term." *In re Northland Aluminum Prods., Inc.*, 777 F.2d 1556, 1561 (Fed.Cir.1985) (internal quotation marks omitted). The district court properly rejected this argument.

#### V.

Under the Anticybersquatting Consumer Protection Act (ACPA), the owner of a protected mark has a cause of action "against anyone who registers, traffics in, or uses a domain name that is identical or confusingly similar to [the owner's] trademark with the bad faith intent to profit from the good will associated with the trademark." *Hawes v. Network Solutions, Inc.*, 337 F.3d 377, 383 (4th Cir.2003); *see* 15 U.S.C.A. § 1125(d)(1). The district court concluded that because it "found defendants' trademark ineligible for protection, there can be no ACPA violation." *Retail Servs.*, 247 F.Supp.2d at

827. Nevertheless, the court also analyzed whether RSI had violated the ACPA as if the FREEBIES mark were not generic, concluding that "there was insufficient evidence ... in this record to sustain a finding that [RSI] registered the domain name in bad faith." *Id.* at 828. We need go no farther than the district court's initial conclusion that defendants cannot state a claim under the ACPA without a valid trademark. This conclusion is compelled from the statutory language.

In pertinent part, the ACPA provides that "[a] person shall be liable in a civil action by the *owner of a mark*, ... if, without regard to the goods or services of the parties, that person ... (i) has a bad faith intent to profit from that *mark* ... and (ii) registers, traffics in, or uses a domain name that ... is identical or confusingly similar to that *mark*." 15 U.S.C.A. § 1125(d)(1)(A) (emphasis added). Under the statute, the term "mark" includes "trademark," which is defined as "identify[ing] and distinguish[ing] [the owner's] goods ... from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C.A. § 1127. As we noted before, a generic term cannot function as a trademark; in fact, to say "generic mark" is to utter an oxymoron. "By definition, something that is generic cannot serve as a trademark because it cannot function as an indication of source." *Sunrise Jewelry Mfg. Corp. v. Fred S.A.*, 175 F.3d 1322, 1325 (Fed.Cir.1999). Thus, a prerequisite for bringing a claim under the ACPA is establishing the existence of a valid trademark and ownership of that mark. As we have already determined that "freebies" is generic and not entitled to trademark protection, defendants cannot surmount this threshold barrier. We therefore affirm the district court's entry of summary judgment against defendants on their cybersquatting counterclaim, and its declaration that RSI's "use of the do-

main name www.freebie.com does not violate the Anti–Cybersquatting Consumer Protection Act." *Retail Servs.*, 247 F.Supp.2d at 829.

## VI.

■ RSI cross-appeals the district court's *sua sponte* dismissal of its request for costs and reasonable attorneys' fees. RSI asserted this claim in its complaint for declaratory relief; it has not yet filed a separate motion for fees and did not seek a ruling on costs and fees as part of its summary judgment motion. Nevertheless, the district court disposed of this question *sua sponte*, without the benefit of briefing or oral argument. The court held that the case did not satisfy the "exceptional" requirement for an award of fees, 15 U.S.C.A. § 1117(a), and that an award of costs was inappropriate as well because "no violation of a registered trademark has been established." *Retail Servs.*, 247 F.Supp.2d at 829. We review a denial of attorney fees for abuse of discretion. *See People for the Ethical Treatment of Animals ("PETA") v. Doughney*, 263 F.3d 359, 370 (4th Cir.2001).

■ "[I]n exceptional cases," the Lanham Act permits the award of "reasonable attorney fees to the prevailing party." 15 U.S.C.A. § 1117(a). The statute does not define what qualifies as an "exceptional case." Like many, if not most, of our sister circuits, we define the "exceptional case" as one in which "the defendant's conduct was malicious, fraudulent, willful or deliberate in nature." *PETA*, 263 F.3d at 370 (internal quotation marks omitted);

see, e.g., *Horphag Research, Ltd. v. Pellegrini*, 337 F.3d 1036, 1042 (9th Cir.2003), cert. denied, —— U.S. ——, 124 S.Ct. 1090, 157 L.Ed.2d 900 (2004); *Tamko Roofing Prods., Inc. v. Ideal Roofing Co.*, 294 F.3d 227, 229 (1st Cir.2002); *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1205 (11th Cir.2001); *United Phosphorus Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1232 (10th Cir.2000); *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 373 (5th Cir.2000). We depart from a number of other courts, however, once the analysis moves beyond the general definition of an "exceptional case." This circuit imposes a dual standard of proof upon prevailing plaintiffs and defendants. A prevailing plaintiff seeking attorney fees must demonstrate "that the defendant acted in bad faith." *Scotch Whisky Ass'n v. Majestic Distilling Co.*, 958 F.2d 594, 599 (4th Cir. 1992); *PETA*, 263 F.3d at 370.[6] However, when an alleged infringer is the prevailing party, he can qualify for an award of attorney fees upon a showing of "something less than bad faith" by the plaintiff. *Scotch Whisky*, 958 F.2d at 599 (internal quotation marks omitted); *accord Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 771 F.2d 521, 526 (1985).[7] Some pertinent considerations for judging a plaintiff's (or counterclaim plaintiff's) conduct when the defendant prevails include "economic coercion, groundless arguments, and failure to cite controlling law." *Ale House Mgmt.*, 205 F.3d at 144 (alterations and internal quotation marks omitted). Thus, the focus tends to be on the plain-

---

6. We note, however, that the bad faith showing required for a violation of the ACPA, *see* 15 U.S.C.A. § 1125(d), is not alone sufficient to establish the maliciousness or willfulness necessary to recover attorney fees. *See PETA*, 263 F.3d at 369.

7. This double standard of proof may ultimately prove infirm under *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 522–26, 114 S.Ct. 1023, 127 L.Ed.2d 455 (1994), which rejected a standard that differentiated between plaintiffs and defendants for the recovery of attorney fees in the copyright context. Today, however, we are not forced to decide whether *Fogerty* requires us to apply a uniform standard under 15 U.S.C.A. § 1117(a).

tiff's litigation conduct or pre-litigation assertion of rights.

The district court cited two factors in support of its conclusion that RSI, having won on the trademark counterclaims, could not satisfy the lesser showing required of a prevailing defendant: (1) the favor-able arbitration decision by the UDRP panelist, tending to show defendants' good faith in filing its counterclaims; and (2) the certificate of registration, also tending to support a good faith belief in the propriety of the counterclaims. *See Retail Servs.*, 247 F.Supp.2d at 829.

RSI contends that the district court's exclusive focus on the Zannons' subjective intent—their good faith belief in the merit of their registration and their infringement claims—improperly omitted consideration of whether the Zannons' legal positions were objectively reasonable. RSI does not challenge the conclusion that defendants had a subjective, good faith belief that their trademark claims were viable. Rather, RSI highlights various portions of the record where defendants assumed a position on the facts that was belied by the record or asserted a specific legal position that was objectively untenable in view of controlling precedent.

The question, however, is not whether snippets of the record or isolated arguments clearly lack merit. We must determine, in light of the entire case, whether defendants' claims and assertions were so lacking in merit that the action as a whole was "exceptional." We have carefully reviewed the materials contained in the joint appendices submitted by the parties, paying particularly close attention to those portions relied upon by RSI. We cannot say that the district court abused its discretion in concluding that this is not an "exceptional case" within the meaning of 15 U.S.C.A. § 1117(a). Moreover, we see nothing in the district court's order to indicate that it ignored the objective aspect of the positions taken by defendants during this case. Furthermore, although it may have been preferable for the district court to solicit input from the parties at a separate hearing on this issue, RSI could have sought to alter or amend the judgment on the question of attorney fees under Rule 59(e) of the Federal Rules of Civil Procedure, which also may have resulted in a more detailed analysis from the district court. RSI chose not to do so, an understandable tactical choice in light of the fact it had just achieved an unqualified victory on the merits. In this case, we will not disturb the district court's decision, which is also the correct one, solely because it was entered *sua sponte* when RSI opted not to seize its opportunity to raise its concerns below via Rule 59(e). Accordingly, we affirm the district court's denial of attorney fees to RSI.

## VII.

For the foregoing reasons, we affirm the decision of the district court in its entirety.

*AFFIRMED*